**In the Matter of C & P GRAY FARMS, INC., Debtor.**

**Bankruptcy No. 86–O1440–3–11.**

United States Bankruptcy Court, W.D. Missouri, W.D.

Jan. 6, 1987.

Bruce E. Strauss, Merrick, Baker, Fox & Haufft, Kansas City, Mo., for debtor.

James C. Jarrett, Heavner, Jarrett & Kimball, Kansas City, Mo., for creditor.

FINDINGS OF FACT AND CONCLU-
SIONS OF LAW SUPPORTING OR-
DER CONDITIONALLY CONFIRM-
ING DEBTOR'S PLAN OF REORGA-
NIZATION

DENNIS J. STEWART, Chief Judge.

The issue of confirmation *vel non* of the debtor's proposed plan of reorganization came on before the court for hearing on December 1, 1986. Whereupon the debtor appeared by Bruce E. Strauss, Esquire, its counsel, and the creditor John Hancock Mutual Life Insurance Company appeared by James C. Jarrett, Jr., Esquire, its counsel. In accordance with the prior orders of the court in this case, the initial and preliminary issue to be determined is that of the sufficiency of the disclosure statement.

### Sufficiency of the Disclosure Statement

■ The objecting creditor complains that the debtor's disclosure statement does not explicitly set out the projected annual cumulative payment to all creditors under the plan. It is further suggested that this total is not clearly juxtaposed to, or compared with, the record of net income for the three years next preceding bankruptcy. Counsel for the debtor protests that the annual payments to each creditor are clearly set out and that all that is necessary to derive the cumulative annual payment to all creditors is to add up these subtotals. In the course of the hearing of December 1, 1986, counsel for the debtor orally disclosed the total annual payment to all creditors projected under the plan is $73,700. He further represented that the annual net income loss for each of the three years next preceding bankruptcy either equals or exceeds that amount.[1] This court is in basic agreement with counsel for the John Hancock Mutual Life Insurance Company that the total annual payment should be explicitly stated in the disclosure statement in such a way that it is easily comparable with the statements of net income for each of the three years next preceding bankruptcy. Under the circumstances of this case, however, the court will, to save time and unproductive effort, make the required disclosure in an order of confirmation which will be conditioned, in part, upon the absence of creditor objections within 21 days. In that manner, the creditors will receive an opportunity to object to confirmation or reject the plan on the basis of the additional disclosure.

The objecting creditor also mentioned that the recent restructuring of a certain debt was not included in the disclosure statement. Since the confirmation of the plan will, as observed above, be conditional, the court will also require a perfect and timely disclosure of the precise facts concerning the reported restructuring of the debt.

### Issue of Confirmation Vel Non

#### Feasibility

■ The objecting creditor contends that the debtor's plan of reorganization is wholly infeasible. The court consequently took evidence on this issue in the course of the hearing of December 1, 1986. The testimony of Carl Patrick Gray, as to the facts underlying the issue of feasibility, was virtually uncontradicted to the effect that the proceeds of harvest to date and the proceeds shortly expected show that debtor's seasonal earnings are "not much off the projections."[2] The evidence thus submitted tended to show that the debtors either presently have or will have the ability to make the payments to creditors for the first year under the plan.[3] The objecting creditor points out that the payments thus made will exhaust the debtor's funds on hand so that there will be none remaining with which to cultivate the crops for the following season. The debtor's rejoinder is that it has the potential for negotiating a loan with the Union State Bank at a rate of 11% interest per annum which could be repaid over the life of the plan.[4] It appears from the evidence that a sufficiently low amount would be needed that it would not be without the realm of likelihood that it could be paid back over the life of the plan.[5]

The evidence on the issue of feasibility especially favors confirmation when it is considered that the debtors' past record

---

1. According to the disclosures made in the course of the hearing of December 1, 1986, the following were the losses suffered by the debtors in the three years next preceding bankruptcy: $184,090 (1984); $110,363 (1985); and $69,801 (1986).

2. It would appear from the testimony of Mr. Gray that the proceeds of harvest to date are in excess of the cash flow necessary to fund the initial year's payments under the plan. In excess of $100,000 has reportedly so far been utilized, which may well be sufficient to fund a plan payment of around $85,000.

3. See note 2, *supra.*

4. And see note 2, *supra.*

5. See note 2, *supra.*

shows that their net income has been such that it could defray the plan at bar [6]; that they have had a shift in the character of their debts from long term to short term [7]; and that even the objecting creditor's expert witness describes the Grays who do the farming for the debtor corporation as "good farmers." [8] The court therefore concludes that the evidence on the issue of feasibility warrants a holding that the debtor should be granted an opportunity to perform the plan of reorganization which has been submitted to the court.

This is so even though the objecting creditor produced two witnesses who believed the plan to be infeasible. The first of these witnesses predicated his conclusion on certain deficiencies in the disclosure statement, the materiality of which is diminished by the evidence of an initial year's crop proceeds which should enable the debtor to make its initial payments under the plan.[9] The other witness appeared to base his contention on the objecting creditor's factual contention that much more interest is due than the debtor proposes to pay under the plan.[10]

### The Rate of Interest to be Paid to John Hancock Mutual Life Insurance Co.

■ The debtor contends that the objecting creditor John Hancock Mutual Life Insurance Company has a security interest in property which has a value approximately equal to the $795,400 plus six-months' interest which the debtor owed John Hancock as of the time of filing. Accordingly, the debtor proposes to pay interest to John Hancock on the value of the property at the rate of 9% per annum, the prevailing legal rate. When there is no equity, or oversecured value, as to which § 506(b) of the Bankruptcy Code would impose the contractual rate of interest, the correct rate of interest is the market rate, which is presumed, in the absence of evidence to the contrary, to be the legal rate (9% in Missouri).[10a] In this case, the note calls for interest at the rate of 11¼% per annum. There is some indication in the evidence that the objecting creditor has the wherewithal to negotiate individual loans which would bring more than 9% interest. But this court does not believe that such constitutes evidence of a rate available in a market of some cognizable commonality and breadth. Thus, this court must approve the proposal of the debtor to pay interest at the legal rate to the creditor John Hancock.

### The "Best Interests of Creditors" Test

■ The evidence which was adduced in the hearing of December 1, 1986, purported to show only a smattering of unsecured value which would be available to creditors on straight liquidation of the debtor's assets under chapter 7—approxi-

---

**6.** Although losses are shown, see note 1, *supra,* the debtor's revampments appear to be such that their projections for the current year will be met.

**7.** It was the uncontradicted testimony of Carl Patrick Gray that this shift in character of the debtor's indebtednesses had taken place over the three years dating from 1983.

**8.** This was the testimony of Floyd C. Brown, Jr., an officer of the John Hancock Mutual Life Insurance Company.

**9.** The witness, Lee Dahmer, the owner of a farm management and agricultural consulting firm, stated that the disclosure statement of the debtor was insufficient in that it contained no projections of 1987 receipts and expenditures; contained no "proven yield history"; contained no government program allocation information;

and contained no account of interest or tracking expenses.

**10.** According to the testimony of Floyd C. Brown, Jr., an officer of the John Hancock Mutual Life Insurance Co., the balance due as of the date of the hearing is $943,481.24. But, this assumes that the entire balance is a fully secured indebtedness bearing interest at the 11¼% contractual rate.

**10a.** With respect to an undersecured creditor, or a creditor whose balance due is only equalled by the value of the security, "the contract rate of interest is not applicable ... [I]nterest is awardable only at the market or legal rate which the general law recognizes to be applicable as compensation for deprivation of a possessory interest in property." *Matter of Johnston,* 44 B.R. 667, 670 (Bkrtcy.W.D.Mo.1984).

mately some $12,000.[11] This evidence contrasts with the indications in the initially-filed schedules that a much greater amount of unsecured value is present.[12] The plan, however, proposes to make this potential issue a moot one by proposing to pay unsecured creditors 100%, but at an uncertain rate and over an uncertain duration of time, from any proceeds which may be available.[13] In the hearing of December 1, 1986, it was indicated that unsecured creditors will be paid, according to the plan, some $5,300 per year to be applied against approximately $240,000 of unsecured debt.[14] The plan, under such circumstances, would last an astronomical length of time—some 45 years. Case authority, however, is unequivocally to the effect that the "best interests of creditors" rule requires that payments be completed within a reasonable time, given the age and ability to perform of the principals of the debtor who must perform the plan.[15] In this case, the chief managing officer of the debtor corporation is relatively young and in robust health. He has a proven ability in farming and should retain his productive capacity over the next two decades. The court can therefore justify permitting the proposed

100% payment to unsecured creditors to extend over the next 20 years, but no longer. A longer duration would reduce the likelihood of payment of the 100% to be paid under the plan to virtually zero, a result which the "best interests of creditors" rule will not permit.

The debtor's proposed plan of reorganization, therefore, can be confirmed only on the condition that payments to unsecured creditors—including 6% per annum interest[16]—be made 100% and completed within 20 years.

In view of the effect which such an increase in plan payments is bound to have on the issue of credibility, it is appropriate that this court calculate the amounts which are to be paid to the unsecured creditors. The necessary starting point is the $192,000 in equipment which is unequivocally scheduled in the debtor's schedules as unsecured.[16a] This court recognizes that, at the inception of the confirmation hearing, the debtor's counsel notified the court that the land and "machinery" in which the Union State Bank had a security interest would be returned to that creditor in return for the extinguishment of the $563,000 in-

**11.** According to the testimony of Carl Patrick Gray in the hearing of December 1, 1986, the total value of unsecured personal property is $1900 plus $9,850 in unsecured crop proceeds.

**12.** In these schedules, the debtor lists farm equipment of a value of $192,000 as unsecured property. It was later revealed in the files and records in this case that at least some of the farm machinery, along with a lease interest in 640 acres of land, was security for a $563,000 indebtedness to the Union State Bank. But, this was not identified with the $192,000 in value of farm equipment which was clearly scheduled as unsecured. In the schedules, Union State Bank is scheduled as a creditor secured in the 640 acres and "farm machinery" of "uncertain" value. In the hearing of December 1, 1986, Carl Patrick Gray testified that the debtor had no equity interest in the 640 acres and, in fact, there was a deficiency of about $100,000. But this does not necessarily negative the possibility that there was enough machinery and equipment to leave the debtor with the clearly scheduled $192,000 equity in the same. This is corroborated by a balance sheet inserted into the initially filed schedules purporting to show $198,912 in "inventory" above and beyond that which extinguished the indebtedness to Union

State Bank—a net worth of debtor nearly $300,000 in excess of liabilities.

**13.** Excess proceeds of crops are to be paid to unsecured creditors in the following manner: "The unsecured creditors will be paid on a pro rato basis from 25% of the funds available following the sale of all crops and after deduction of all crop expenses."

**14.** "The unsecured claim of John Hancock Mutual Life in the amount of $198,902.28 and the unsecured claim of Cecil E. Gray, Jr. in the amount of $41,500.00 will be paid from the funds available from crop proceeds after deducting expenses." "The first year the anticipated amounts of payments will be as follows: John Hancock Mutual Life ... $4,387.00 Cecil E. Gray, Jr. ... $963.00."

**15.** Otherwise, an indefinite term plan can give no assurance that the creditors will *ever* receive as much as they would in straight liquidation under chapter 7.

**16.** See note 19, *infra.*

**16a.** See note 12, *supra.*

debtedness to that entity. But, no satisfactory proof of the value of the surrendered interest in land has ever been adduced, and the court, accordingly, cannot assume that its value would not cover the entire indebtedness to Union State Bank. This is especially so, when as observed above, the $192,000 value of equipment is plainly scheduled as unsecured. Further, the balance sheet attached to the schedules shows an even greater magnitude of unsecured property.[17] This will cover substantially all the unsecured claim of the creditor John Hancock Mutual Life Insurance Company, and leave the option to the debtor's president as to whether to insist on payment of his unsecured claim as a prerequisite to confirmation.[18]

So, 192,000 is the principal amount which must be paid over the 20–year period which can constitute the duration of the plan. The annual principal payment must thus amount to $9,600. And the Bankruptcy Code clearly requires that interest be paid on an unsecured claim which is a subject of deferred payments so that the unsecured creditor receives the full value of his claim "as of the effective date of the plan." [19] Again, the issue arises as to what rate of interest—in the absence, in the case at bar, of any explicit evidence on the subject—should be employed. In this regard, it is the belief of this court that the ordinary rate should be lower than that applied when an institutional secured creditor seeks interest on the value of security. It must be assumed that a rate broadly and standardly applicable to a class of unse-

cured creditors, many, if not most, of whom do not have the lending leverage of secured creditors would more nearly approach the market rate currently available to consumers without any special commendations—a rate which the court may well take judicial notice to hover currently around 6% per annum. Computing that rate of interest on the declining balance of $192,000 being paid at $9600 per annum over a duration of 20 years obtains a total of $108,200 to be paid over that period of time.[20] This cost, the court believes, could be more easily borne by the debtor if it were evenly distributed over the 20 years at $5410 per year. Thus, the appropriate annual total payment to unsecured creditors is $15,010.

### *The Absolute Priority Rule*

■ This same result would be reached separately and independently in applying the "absolute priority" role—which holds that "a dissenting class of unsecured creditors must be provided for in full before any junior class may receive or retain any property under the plan, unless the junior class contributes to the reorganization enterprise something that is reasonably compensatory and is measurable." *In re Ahlers*, 794 F.2d 388, 403 (8th Cir.1986). The debtor's principals constitute a junior class within the meaning of that rule, and they would retain property without paying the other unsecured creditor in full. In determining whether the junior class has contributed "something ... reasonably compensatory

---

17. See note 12, *supra.*

18. If he insists on such payment, in the absence of his subordinating his unsecured claim to the unsecured claim of John Hancock Mutual Life Insurance Company, then, in accordance with the principles enunciated below in the text of this memorandum, in respect of the absolute priority rule, denial of confirmation can be the only imaginable result.

19. A plan is "fair and equitable," within the meaning of § 1129(b)(1) of the Bankruptcy Code, only if, *inter alia,* "the plan provides that each holder of a claim of [each unsecured class] receive or retain on account of such claim property of a value, *as of the effective date of the*

*plan,* equal to the allowed amount of such claim." (Emphasis added.)

20. The calculation has been made on the declining balance of $192,000, paid at the rate of $9600 per year principal. The following are the yearly amounts of interest calculated by the court:

| | | |
|---|---|---|
| $10,944.00 | 6,912.00 | 2,820.00 |
| 10,368.00 | 6,336.00 | 2,244.00 |
| 9,792.00 | 5,760.00 | 1,688.00 |
| 9,216.00 | 5,184.00 | 492.00 |
| 8,640.00 | 4,548.00 | 396.00 |
| 8,064.00 | 3,972.00 | |
| 7,488.00 | 3,396.00 | |

and ... measurable," the bankruptcy court must—from evidence "which embraces all facts relevant to future earnings capacity," *In re Landau Boot Co.*, 13 B.R. 788, 792 (Bkrtcy.W.D.Mo.1981)—determine whether "the value of the [debtors'] yearly contributions of labor, experience and expertise over the life of the plan will equal or exceed the value of the retained ownership interest at maturity." *In re Ahlers, supra,* at 405. No evidence was explicitly adduced on this issue and there is thus no showing. The only conceivable evidence of the value of the services of the debtor's principals is the salary to be commanded by them during these proceedings—and they will be fully compensated for those services by that value. And for this court to make, in any event, the finding which appears to be required by *In re Landau Boot Co., supra,* at 793—that "the probability of debtor['s] making a profit in the next two years is unlikely" and, therefore, "the new investors are making a substantial investment which exceeds any value which can be realized from the business in the foreseeable future"—would necessarily impeach the foregoing finding of feasibility and necessarily require denial of confirmation.[21] The court therefore concludes that the unsecured claim of the John Hancock Mutual Insurance Company be promised to be paid according to the above and foregoing calculation as a prerequisite to confirmation.

### Feasibility Revisited

The imposition of a duty upon the debtor to make payments to unsecured creditors

of $15,010 per annum, rather than the $5,350 proposed in the plan, places further stress on the already close question of feasibility. The objecting creditor John Hancock Mutual Life Insurance Company has expressed its concern, further, at the conclusion of the hearing of December 1, 1986, that confirmation of the plan at this time would result in the debtor's skipping the first annual payments under the plan and making them wait an additional year for their annual payment. But, the lingering issue of feasibility, particularly as complicated by the duty to make the additional payment to unsecured creditors, will not admit of any delay in making the first annual payments. Confirmation of the plan must, therefore, *inter alia,* be conditioned upon prompt payment of the initial yearly payments provided by the plan within 30 days of confirmation or such additional time as the court may grant for good cause shown in writing within that 30 day period.

### Other Conditions of Confirmation

■ Section 1141(d)(1) of the Bankruptcy Code provides that, "[e]xcept as otherwise provided in this subsection, in the plan, or in the order confirming the plan, the confirmation of a plan ... discharges the debtor from any debt that arose before the date of confirmation ..." The debtor corporation, in the case at bar, does not come within any of the statutory exceptions to that

---

21. This seems to be the universally occuring problem with the so-called doctrine of "sweat equity." It is so artificial and inappropriate that it can exist only where the debtor's operations are in reality so unpromising that an honest and conscientious court would be obliged to find the plan infeasible. The court in the *Ahlers* case is to be admired for groping for some device, however unsound, which will ameliorate the desperate plight of the American farmer. The court in *Ahlers* fixed its focus on the absolute priority rule because it perceived that that rule was primarily responsible for the denials of confirmation of farm chapter 11 plans. "Any other view would deny to most farmers the opportunity to take advantage of the reorganization provisions of the Bankruptcy Act." 794 F.2d at 405. But, more persuasive than the

wholly artificial and impossible concept of "sweat equity" are those decisions which simply hold that the debtor need not pay more for the farm property than it is worth. See *Wright v. Vinton Branch of Mountain Trust Bank,* 300 U.S. 440, 468, 57 S.Ct. 556, 81 L.Ed. 736 (1937) ("[I]t must be assumed that the mortgagor will not get the property for less than its actual value ..."); *Matter of Alexander,* 48 B.R. 110, 117 (Bkrtcy.W.D.Mo.1985) ("[T]he Supreme Court has ... [thus] defined the outer limits of the mortgagee's property rights [and], in so doing, necessarily bestowed the remainder of the rights existing in mortgaged property, in light of the provisions of the Fifth Amendment, upon the mortgagor.") But, in this case, this court must regard itself bound by the *Ahlers* decision.

subsection.[22] This court, therefore, will follow its usual practice of withholding discharge until full consummation of the plan by the debtor. Any other course of action would be to confer upon the debtors an unmerited advantage whereby their simply *offering*, in the confirmed plan, to pay certain debts as they are compromised or extended in that plan, operates to extinguish the original indebtedness.[23] This court refuses, as a matter of course, to allow such a compromise or extension to be effected without performance. It seems only fair that, if the debtor does not demonstrate its right to the discharge by actually performing its plan, the original indebtednesses should remain undischarged.

█ It should also be provided that any debts which may be found to be nondischargeable within the meaning of § 523 of the Bankruptcy Code are not discharged by any order of confirmation, or of consummation, or of general discharge. As observed above, the debtor in this case, albeit a corporate debtor, has the same material characteristics as an individual chapter 11 debtor. But, under the provisions of § 1141(d)(2) of the Bankruptcy Code, only an individual debtor appears to be subjected to the nondischargeability provisions of § 523. "The confirmation of a plan does not discharge *an individual debtor* from any debt excepted from discharge under § 523 of this title." (Emphasis added.) But, § 1141(d)(1), *supra*, grants the bankruptcy court the power to impose the same strictures on a corporate entity in its provision that the bankruptcy court may provide for non-discharge "in the order confirming the plan." In accordance with the foregoing considerations, this court has uniformly provided against such discharge upon confirmation in a corporate chapter 11 case and has routinely heard and determined nondischargeability actions in corporate chapter 11 cases, see, e.g., *Matter of Koran Enterprises, Inc.*, 61 B.R. 321 (Bkrtcy.W.D.Mo.1986), while looking ahead to the entry of such an order of conditional confirmation as is being entered in this case.

In order, further, to ensure that the court continues to have the power to ensure that the plan is either timely performed or that the chapter 11 case is dismissed or converted [24] for failure to comply with the terms of the confirmed plan or demonstrated inability to effectuate any plan, the order of confirmation should provide for retention of jurisdiction by the bankruptcy court to reopen the case for any purpose up to and including the time of entry of an order of consummation.

Therefore, in consonance with the foregoing findings of fact and conclusions of law, an order of confirmation will be entered on the following conditions: (1) that no creditors object in writing to the sufficiency of disclosure within 21 days of the date of service of a copy of this memorandum upon them and within 21 days after debtor serves upon them a copy of an explanation of the abovementioned debt restructuring; (2) that the plan of reorganization be deemed amended so as to increase the annual and total payments to unsecured creditors in accordance with the above and foregoing considerations; (3) that the initial yearly payments required by the terms and provisions of the confirmed plan be completed within 30 days of confirmation or within such additional time as the court may grant for good cause shown in writing within the same 30 days; (4) that discharge of the debtor be withheld until full consummation of the confirmed plan of reorganization; (5) that the debtor remain subject to the provisions of § 523 of the Bankruptcy Code; and (6) that the court

---

**22.** Which apply only if the corporate debtor's plan, *inter alia*, "provides for the liquidation of all or substantially all of the property of the estate." Section 1141(d)(3) of the Bankruptcy Code.

**23.** It may be true that the plan itself becomes the equivalent of a promissory note. But, there is no reason why the debtor should be entitled to compromise or extension of debts without performing their obligations under the substituted promises.

**24.** See note 23, *supra*. See § 1112(b) of the Bankruptcy Code.

retain jurisdiction to reopen this case for any and all lawful purposes until full consummation of the confirmed plan.