In re SNIDER FARMS, INC., Debtor.

Bankruptcy No. 87–60512.

United States Bankruptcy Court,
N.D. Indiana,
Hammond Division.

Feb. 17, 1988.

Gordon E. Gouveia, Merrillville, Ind., for debtor.

David Thuma, Indianapolis, Ind., for Equitable Life Ins.

Richard Browne, Valparaiso, Ind., for Northern Indiana Bank and Trust.

## MEMORANDUM OPINION AND ORDER

KENT LINDQUIST, Chief Judge.

### I

### *Statement of Proceedings*

This case came before the Court on a Modification of Debtor's First Amended Plan filed by the Debtor on January 21, 1988.

The Court previously entered Orders on January 5, 1988, denying the Debtor's First Amended Plan filed October 27, 1987, and on October 19, 1987, denying confirmation of the Debtor's original plan filed June 24, 1987. The objectants to the original plan were Equitable Life Assurance Society of the United States (hereinafter: "Equitable"), the Chapter 12 Trustee, and Northern Indiana Bank and Trust (hereinafter: "NIB"). The objections by the Trustee and NIB to the Debtor's initial plan were resolved by stipulation with the Debtor as set out in the Court's Order of October 19, 1987 (Opinion, p. 2), and the Amended Plan and the Amended Plan as modified did not necessitate a modification of said stipulation, and thus those issues are still resolved as to the Trustee and NIB.

The Court denied confirmation of the Debtor's initial plan after a full evidentiary hearing was held on the value of the Debt-or's property subject to Equitable's lien. As a result the Court fixed the value of said property at $521,265.00 rather than the amount of $424,000.00 proposed by the Debtor or the sum of $593,175.00 as asserted by Equitable.

Upon denial of the initial plan, and the filing of the Debtor's First Amended Plan, the only objectant to the Amended Plan was Equitable.

On December 16, 1987, the Court held a full evidentiary hearing only as to the issue of the feasibility of the Debtor's Amended Plan pursuant to 11 U.S.C. § 1225(a)(6), the amount of Equitable's allowed secured claim and the objections of the Trustee and NIB having been resolved by the Court's Order of October 19, 1987. The Debtor's Amended Plan at Clause 3.3 proposed to pay Equitable the value of Equitable's allowed secured claim or $521,265.00 as fixed by the Court's October 19, 1987, Order. The Amended Plan proposed to provide Equitable with the present value of said allowed secured claim pursuant to 11 U.S.C. § 1225(a)(5)(B), by paying Equitable interest thereon at the rate of 8.98% per annum, with principal and interest being paid in thirty annual installments.

Although a full evidenitiary hearing was held on December 16, 1987 exclusively on the issue of the feasibility of the Debtor's Amended Plan, the Court in its Order of January 5, 1988, denied confirmation of the Amended Plan on the independent grounds that the interest rate of 8.98% per annum did not provide Equitable with the present value of its allowed secured claim of $521,-265.00. Thus, although the December 16, 1987 evidentiary hearing resulted in a full submission on the merits on the issue of feasibility of the Debtor's Amended Plan, no findings of fact, conclusions of law or order was entered on that issue in that the Court found that the Debtor's Amended Plan was not confirmable because of its failure to pay Equitable the present value of its allowed secured claim. Thus the plan was not confirmable as then constituted whether feasible or not.

Therefore, the Court has heard all relevant and material evidence and considered

all allowable objections as to the Debtor's Amended Plan as modified by its January 21, 1988 filing for the Court to determine whether the Amended Plan as modified meets the requirements of 11 U.S.C. § 1225 as to a confirmable plan, and this Order is thus being entered without further notice and hearing.[1]

The Debtor's Amended Plan as modified proposes to pay Equitable as follows:

3.3 *Class III: Equitable Life Assurance Society of the United States (Equitable):* The Debtor shall pay the secured claim of Equitable in the amount of $521,265.00 as follows:

a. Commencing thirty (30) days after the effective date of the Plan, the Debtor shall pay the principal amount as stated above in annual payments for a period of thirty (30) years at an interest rate or discount factor not to exceed the interest rate on a United States treasury bond maturing in the year 2017 as announced in the Federal Reserve Statistical Release existing on the date of confirmation, with a risk premium to be determined by the Court taking into consideration the rehabilitation aspects of Chapter 12, the feasibility of the Plan, the court supervision of the Debtor's payments to creditors under the Plan, the elimination of considerable debt by the Debtor, the supervision of the Plan by the Chapter 12 Trustee, and the protection of the Debtor's assets by virtue of the automatic stay.

b. The Debtor shall have the right to pre-pay all or any part of the principal indebtedness at any time.

II

*Findings of Fact*

A

PRESENT VALUE OF EQUITABLE'S ALLOWED SECURED CLAIM

The Court in its Order of January 5, 1988, took judicial notice of Federal Re-

serve Statistical Release H. 15 dated December 14, 1987, and noted that as of December 14, 1987, the interest rate of 30 year U.S. treasury bonds was 9.31%, this being the risk-free rate of return Equitable could receive at that time, and that said interest rate would serve as a benchmark or base line as to the irreducible minimum interest rate the Debtor's plan would have to pay Equitable in order that Equitable receive the present value of its allowed secured claim. The Court further indicated that to this baseline interest rate would have to be added a "risk premium" based on the length of the Debtor's proposed stretchout of the payment of Equitable's lien to 30 years, i.e. the modified term of the mortgage, the fact Equitable is undersecured, i.e. the "forced loan" amount in the plan to value of collateral ratio is one to one, the quality and depreciability of the collateral, the risk of default, the cost, time and difficulty of liquidating the collateral, and the feasibility of the plan (including consideration of the amount of debt discharged by the confirmed plan).

The Court cannot write the Debtor's plan for it; however, the Debtor's plan itself expressly consents to this Court fixing the interest rate based on a formula by which the Court will combine a base rate ascertained by reference to a 30 year U.S. treasury bond, and adding thereto a risk premium to be determined by the Court taking into consideration the various factors set out in its Order of January 5, 1988. Thus, even though the Debtor's Amended Plan as modified does not set out a fixed, ascertainable interest rate, it does specifically consent to an interest rate based on those factors the Court held to be relevant and thus the Court holds that the plan does not fail for a lack of specificity.

The Court again takes judicial notice of Federal Reserve Statistical Release H. 15. However, the Court will take judicial notice of the Statistical Release dated February 8, 1988, or the most current re-

1. The Court by incorporation by reference includes its Findings of Fact and Conclusions of Law as set out in its Memorandum Opinions and Orders dated October 19, 1987, and January 5, 1988, in this Memorandum Opinion and Order.

lease as of the time the Court is now considering whether the Debtor's Amended Plan as modified is confirmable. That Release, states that the present interest rate on 30 year U.S. treasury bond is 8.39%. Thus, to this base, risk-free interest rate, the Court will add a risk premium of 1.86 percentage points, and find that the Debtor's plan must pay Equitable an interest rate of 10.25% per annum, and that this will result in the Debtor's plan paying Equitable the present value of its allowed secured claim of $521,265.00 on the effective date of confirmation pursuant to 11 U.S.C. § 1225(a)(5)(B). These factors require an annual payment of $56,461.00 in principal and interest to liquidate this debt over 30 years.

## B

### *Feasibility*

Whether, the Debtor's amended Chapter 12 Plan as modified is feasible represents the final issue to be resolved by the court as to whether the plan is confirmable. This issue is certainly the most difficult task. The Court is in effect required to predict based on the historical data provided by the parties and published sources, current conditions, and certain assumptions and projections made thereon, whether the Debtor will "be able to make all payments under the plan and to comply with the plan." 11 U.S.C. § 1225(a)(6). Identical language is found in Chapter 13. 11 U.S.C. § 1325(a)(6). Feasibility is also required to confirm a Chapter 11 plan pursuant to 11 U.S.C. § 1129(a)(11), which provides that a Court will confirm a plan only if, "confirmation is not likely to be followed by liquidation, or the need for further financial reorganization...."

■ Chapter 12 is modeled on Chapter 13. *See* H.R. 5316, 99th Cong. 2nd Sess. 132, Cong.Rec.H. 8999 (1986). Thus, Chapter 13 case precedents provide a useful tool for the interpretation of Chapter 12 because of the identical language in the confirmation provisions of both Chapters. *In re Janssen Charolais Ranch, Inc.* 73 B.R. 125, 126 (Bankr.D.Mont.1987); *In re Beyer,* 72 B.R. 525, 527 (Bankr.D.Colo.1987). This

is also true of the cases interpreting the feasibility of Chapter 11 plans pursuant to 11 U.S.C. § 1129(a)(11) for although the language is not the same, the concept of feasibility, i.e. the ability to perform under the plan is still the focus of that section.

As noted in the Statement of Proceedings, *supra,* the evidentiary hearing held on December 16, 1987, resulted in a full submission on the merits as to whether the Debtor's Amended Plan filed October 27, 1987 was feasible. However, the Court did not issue findings of fact and conclusions of law on feasibility in that it denied confirmation of the Amended Plan based on the failure of the Debtor to provide for an adequate interest rate to Equitable in order that it would receive the present value of its allowed secured claim.

Accordingly, the Court's findings of facts and conclusions of law as to the feasibility of the Debtor's Amended Plan as modified filed on January 21, 1988, will be based on the evidence submitted at the December 16, 1987 evidentiary hearing.

The testimony of the principal of the Debtor, David E. Snider and Equitable's expert witness, Robert Sutter, P.H.D. is summarized at pp. 7–19 of the Court's January 5, 1988 Memorandum Opinion and Order.

The initial question is whether the Debtor's gross income for 1987 was an anomaly, or whether it can be reasonably expected that it will be able to consistently achieve the same type of yields and prices in the future.

Snider testified that the 1987 yield for 532 acres of soybeans was 37 bushels per acre or a total of 19,684 bushels. Snider related that approximately 70% of the soybeans sold for $5.15 net a bushel, i.e. after transportation and elevator expenses. The balance of the soybeans or 4,000 bushels was in storage. The Debtor projected that the balance should sell for $5.50 or $5.75 net per bushel for an additional $22,000.00. (This would be $5.50 a bushel). The Debtor's Amended Summary of Operations filed September 10, 1987, projected total proceeds from soybeans to be $104,321.00.

The Debtor's gross income for soybeans for 1987 is now estimated by the Court to be $102,360.00 based on the Debtor's oral testimony as to the amount of soybeans sold and amount left in storage. Snider's statement that 70% of the soybeans had been sold and that 4,000 bushels were left to be sold cannot be mathematically correct. 70% of 19,684.00 bushels sold equals 13,778 bushels × $5.15 a bushel or $70,-960.82 plus $22,000.00 to be realized based on the 4,000 left in storage to be sold at $5.50 a bushel. If 4,000 of the 19,684 bushels of soybeans were left, this means 15,-604 bushels were sold at $5.15 a bushel or for a total of $80,360.60. This, together with $22,000.00 in soybeans to be sold equals $102,360.00 for the 1987 crop year.

*Compare,* Debtor's Amended Summary of Operations filed September 10, 1987 with the Court in which estimated gross income on soybeans was $104,321.00 where the yield was estimated at 40 bushels per acre with a price per bushel of $4.90.

Snider also testified that the Debtor's yield for corn in 1987 was 127 to 128 bushels per acre based on 243.5 acres or an estimated 30,752 bushels of corn. (30,752 bushels divided 243.5 acres equals 126.29 bushels per acre). Given a CCC loan rate of $1.91 per bushel of corn, Snider estimated the gross income (or CCC loan value) to be approximately $60,000.00. *Compare,* the Debtor's projected gross income for corn in its Amended Summary of Operations filed September 10, 1987, where the projected income for 1987 for corn was $60,461.00 (243.5 acres × 130 bushels × $1.91). Based on 127 bushels per acre at $1.91 per bushel, the gross income for corn in 1987 would be $59,066.00.

In addition, the Debtor projects approximately $18,860.00 annually in income from government set aside programs.

Accordingly, the Court finds that the Debtor's gross income from all sources in 1987 will be as follows:

| | |
|---|---|
| Corn: | $ 59,066.00 |
| Soybeans: | $102,360.00 |
| Government Set Aside Prog. | $ 18,860.00 |
| GROSS INCOME | $180,286.00 |

Dr. Sutter asserted that the yields for corn were abnormally high in 1987 and that based on his analysis (*See* Respondent's Ex. no. 2, Economic Analysis of Chapter 12, Reorganization Plan, dated December 7, 1987; (hereinafter: "Analysis"),

The ten year average for corn in Porter County, the county where the Debtor's farm is located, was 105.6 bushels per acre, and that based on his examination of ASCS records of the Debtor, its yield for corn based on a five year average was 113 bushels per acre. Sutter also noted that the average yield per acre for corn was 104 bushels per acre in 1985 and 118 in 1986, and that a good average for corn over the next 10 years would be 115 bushels per acre. (Analysis, p. 5,). He also noted that the trend line for crop yields has a positive slope because under the set aside program now in effect, the better land is used to grow crops.

As to soybeans, Sutter stated that there is an estimated average of a 32% relationship between corn to soybeans, and thus the Debtor's relationship of 34% or 37 bushels per acre seemed to be a good average. Per Sutter, the ten year average for soybeans was 33.3 bushels per acre while the average for 1985 was 38 bushels per acre and 36 bushels per acre for 1986 (Analysis p. 5).

The Court also notes that based on the Debtor's Amended Summary of Operation, filed September 10, 1987, its 1986 yields were 122 bushels per acre for corn and 37 for soybeans.

The Debtor testified that the ASCS records are not current as the Debtor had not reported to that agency for some eight to ten years, and that the Debtor has had consistently higher yields in the recent past than the 113 bushels per acre for corn reflected on the ASCS records, but no concrete evidence was submitted by the Debtor whatsoever as to what those historical yields actually were.

Although the Debtor provided no written pro forma projections whatsoever on ex-

pected yields for corn and soybeans, or any evidence it could continue to produce the yields achieved in 1987 year in and year out, the Court is persuaded and therefore finds that the Court can reasonably project that the Debtor can consistently obtain a yield of at least 122 bushels per acre for corn and 37 bushels per acre for soybeans, based on the historical data provided it, the quality of the Debtor's land, and the Debtor's proven ability to farm effectively. While 1987 generally proved to be a highly productive year for corn, it cannot be reasonably projected that the Debtor can consistently produce 127 bushels per acre for corn year in and year out. (In the last 10 years only 1982 has an average yield near the Debtors' 1987 figures when the yield was 126 bushels per acre. *See* Analysis, p. 5.) Nevertheless, although the Debtor presented no evidence to indicate that it can sustain its 1987 yield for corn, which exceeded even the highest yield over the past ten years, year after year, the Debtor has demonstrated an ability to produce a corn yield somewhat above the norm, and a soybean yield slightly above the norm, as seen by the fact that it had a yield of 122 bushels per acre for corn and 37 bushels per acre for soybeans in 1986 when the average yield was 118 bushels an acre for corn and 36 bushels per acre for soybeans.

The question of the price that will be received for the Debtor's crops in the future is a matter of even greater conjecture than the yields, given the vicissitudes of the weather, government programs, ever-changing market forces influencing supply and demand, the value of the dollar, and changes in demand for exports. No one, including the most sophisticated agricultural economist or statistician, can predict prices with any degree of certainty.

Sutter testified that the ten year average price for corn was $2.44 per bushel and $6.21 per bushel for soybeans. (*See* analysis p. 5). However, the average 1986 price for corn was only $1.50, while the average 1986 price for soybeans was $4.65. The Debtor's prices in 1986 were $1.81 for corn

and $4.65 for soybeans based on his Amended Summary of Operations filed September 10, 1987. Thus, the price received by the Debtor for corn was well above the 1986 average. Sutter related that although he felt the "target" price for corn would decrease 4 to 5 cents a bushel in 1988, no basis was given for this projection, and he was not certain that this would be the case for corn grown in Porter County.

The Court takes judicial notice of Indiana Agricultural Statistics—1986, issued by the Indiana Agricultural Statistics Service, a cooperative publication of the U.S. Department of Agriculture and Purdue University. That publication noted, at page 32, that the average price of corn was $1.50 per bushel in 1986, which was 70 cents below the average price of $2.20 in 1985, and that the average price for soybeans was $4.70, a 34 cent per bushel drop in price from 1985. Thus, the depressed prices of 1986 do not seem to be a good indicator in projecting the prices the Debtor's crops will bring in the future, and every indicator would seem to point to the conclusion that the increased prices received in 1987 will firm up at present levels, if not increase slightly, in the near term. Accordingly, the Court will assume based on historical data and current conditions that, at a minimum, the Debtor can continue to sell its corn for at least a $1.91 per bushel and its soybeans for at least $5.50 a bushel, although the Debtor presented no evidence other than historical yields and prices to buttress this conclusion than the actual 1986 corp data. In fact, no evidence was presented by the Debtor whatsoever that yields or prices in the future would increase, decrease or stay the same.

Based on these figures, the Debtor's projected annual gross income, in the near term, is estimated to be approximately as follows:

1. Corn: 122 bushels per acre × 243.5 acres × $1.91 per bushel = $ 56,740.37
2. Soybeans: 37 bushels per acre × 532.25 acres × $5.50 per bushel = $108,312.88

3. Government set aside programs = $ 18,860.00

    Projected Annual Gross Income    $183,913.25

Based on the evidence presented to it, the Court finds these figures to be the most reasonable estimate of the Debtor's projected annual gross income in the near term.

If the Court optimistically assumed an approximate 10% increase in corn and soybean prices over 1987, and continued high yields as set out above this scenario would result in the following figures:

1. Corn: 243.5 acres × 122 bushels per acre

    × $2.10 a bushel      =    $ 62,384.70

2. Soybeans: 532.5 acres × 37 bushels per

    acre × $6.05 a bushel      =    $119,200.13

3. Governmental set aside programs = $ 18,860.00

    Projected Gross Income    $200,444.83

However, the Court can find no objective basis in the record to realistically assume such price increases.

An alternate method of calculation would be to arbitrarily use the average yields and prices for the last ten years in Porter County. The average yields for corn during this period was 105.6 bushels per acre and 33.3 bushels per acre for soybeans. The average price per bushel of corn over the last 10 years was $2.44 and $6.21 for soybeans. Using these figures would result in the following projected gross income:

1. Corn: 243.5 acres × 105.6 bushels per

    acre × $2.44 a bushel      =    $ 62,741.18

2. Soybeans: 532.25 acres × 33.3 bushels

    per acre × $6.21 a bushel      =    $110,065.57

3. Government set aside programs = $ 18,860.00

    Projected Annual Gross Income    $191,666.75

However, based on the Debtor's production in 1986 and 1987, and the Debtor's ASCS records, even if not current, the Court may assume that the Debtor's yields will be somewhat higher than these averages. However, it cannot assume the average price received in the past ten years will be received in the future based on the historical record.

A fourth set of assumptions may include Sutter's projection that an estimated yield of 115 bushels per acre for corn (9.4 bushels above the 10 year average) and 37 bushels of soybeans per acre (3.7 bushels above the 10 year average), and to use the 10 year average price for corn of $2.44 per bushel and $6.21 per bushel for soybeans as set out in Sutter's Analysis at page 5. Based on these assumptions, the Debtor's projected gross income would be as follows:

1. Corn: 243.5 acres × 115 bushels per acre

    × $2.44 a bushel      =    $ 68,326.10

2. Soybeans: 532.25 acres × 33.3 bushels

    per acre × $6.21 a bushel      =    $110,065.57

3. Governmental set aside programs = $ 18,860.00

    Projected Annual Gross Income    $197,251.67

However, based on current prices there has been no reasonable prognosis provided to the Court for it to assume that prices will return to previous levels, at least in the near term.

On the expense side, the Debtor showed $110,000.00 in total actual and projected operating expenses for 1987. *See* Debtor's Amended Summary of Operations filed September 10, 1987.

The Court notes that the Debtor's initial Summary of Operations filed April 10, 1987 showed estimated operating expenses to be $129,000.00. Several items of expense were reduced in the September 10, 1987, Amended Summary without explanation by the Debtor, i.e. hired labor was reduced from $20,000.00 to $18,736.00 (the Court assumes this is the salary paid to Snider by the Debtor for personal living expenses by him. No indication was given by the Debtor how this figure could realistically be reduced). Taxes were reduced from $15,-000.00 to $7,700.00. Taxes are a relatively fixed item, and the Court wonders how the

Debtor could make such a major error in its computation in the April 10, 1987 Summary. Nevertheless, the Court will accept the amended figures as to taxes for the purposes of this opinion.

At the time of the hearing, Snider stated that it had only $1,200.00 to $1,500.00 cash on hand.

Sutter testified that the Debtor's expenses were reasonable and proper as far as they went, but did not take into account the required annual payment to unsecured creditors of $7,842.00, the Chapter 12 Trustee's commission on plan payments, the repair and replacement of equipment, any legal expenses, the interest on the Debtor's annual operating loan with NIB, the lease payments on leased land, and an interest rate on Equitable's allowed secured claim for one in keeping with current market rates.

Sutter also noted that although the Debtor was capable of increasing its yields this benefit would have a cost. The Debtor would have an increase in expenses such as seed, fertilizer and harvesting, and that each additional dollar of revenue is usually accompanied by 30 to 35 cents in increased costs.

The Court finds that the Debtor's operating expense figures set out in the Debtor's Amended Summary of Operations are reasonable and accurate, with a question mark as to taxes. The Court further finds that the figures do include adequate provisions for repairs and legal and accounting fees, but to these expenses must be added the $7,482.00 annual payment to unsecured creditors, the Chapter 12 Trustee's commissions, the increased debt service to Equitable based on the finding that the Court

2. This figure could be reduced to $4,478.00 if the Debtor elected to make these payments over 5 years as proposed in his Amended Plan as modified or a difference of $3,004.20 annually.

must pay Equitable's allowed secured claim in the sum of $521,265.00 over 30 years at 10.5% per annum on an annual basis which is $56,461.00 per year rather than the $41,000.00 as projected in the Debtor's Amended Summary of Operations filed September 10, 1987, and the interest expense to NIB on its annual operating loan, together with some reasonable reserve or cushion for unforeseeable expenses.

The Chapter 12 Trustee's commission per the standing order of the Court is 10% on all payments to unsecured creditors and 2% of all annual payments to secured creditors. Thus, the Trustee's annual commissions are as follows:

| | Payee | Annual Payment | Annual Commission |
|---|---|---|---|
| 1. | Unsecured Creditors | $ 7,482.20 | $ 748.22 (10%) |
| 2. | NIB | 3,543.00 | 70.86 (2%) |
| 3. | NIB | 16,353.00 | 327.06 (2%) |
| 4. | Equitable | 56,461.00 | 1,129.22 (2%) |
| Total Trustee Commissions On Annual Basis | | | $ 2,275.36 |

The total annual operating expenses and payments to unsecured creditors, lienholders, debt service on annual operating loan, and the trustee's commission from the Debtor are as follows:

1. Debtor's Operating Expenses exclusive of debt service, Trustee Commissions and payments to unsecured creditors (p. 3 of Debtor's Amended Summary of Operations filed Sept. 10, 1987) — $110,000.00
2. Annual payment to unsecured creditors — $ 7,482.20 2
3. Annual payment to NIB on debt of $36,400.00 — $ 3,543.00
4. Annual payment to NIB on debt of $82,500.00 — $16,353.00
5. Annual payment to Equitable on debt of $521,265.00 — $56,461.00
6. Annual payment of Chapter 12 Trustee's Commission — $ 2,275.36

A plan may be extended beyond three years only upon approval by the Court for "cause shown" pursuant to 11 U.S.C. § 1222(c).

7. Debt service on annual operating loan by NIB (The Court has estimated this to be 11%, of up to $80,000.00 for period from March through August each year. Assume average balance of $40,000.00 for 6 months at 11% per annum would equal an annual interest expense of $2,200.00) 3 — $ 2,200.00

*Total Annual Payments* — $198,314.56 4

The above figures do not provide any monies whatsoever for the replacement of capital (machinery and equipment), or a contingency fund for unexpected or emergency expenses for the Debtor or "hired labor", i.e. Snider and his dependents, which should probably be three to five percent of total operating expenses or a base minimum of $3,300.00 to $5,500.00. At the hearing the Debtor related it had only $1,200.00 to $1,500.00 cash on hand and still owed NIB $15,000.00 on its operating loan. While the Debtor testified that the NIB operating loan and Equitable's first annual payment would be made out of the proceeds from the sale of the crops in storage and the yet unreceived check from the set-aside program, the adequacy of these monies to meet these expenses is questionable.

### III

#### *Conclusions of Law and Discussion*

The Court has reviewed the relevant case law dealing with confirmation of a plan in Chapters 11, 12 and 13 in an attempt to arrive at a workable criteria to ascertain if a plan is feasible.

As stated by the Court in *In re Agawam*, 63 B.R. 612 (Bankr.D.Mass.1986):

The purpose of section 1129(a)(11) is manifold: 1) " 'to prevent confirmation of visionary schemes which promise creditors and equity security holders more under a proposed plan that the debtor can possibly attain after confirmation,' " *In re Pikes Peak Water Company*, 779 F.2d 1456, 1460 (10th Cir.1985), *quoting*, *In re Pizza of Hawaii, Inc.*, 761 F.2d 1374, 1382 (9th Cir.1985) and L. King, 5 *Collier on Bankruptcy* par. 1129.01 [11] (15th ed. 1984); 2) to prevent an abuse of the reorganization process by the confirmation of a plan of a debtor likely to return to bankruptcy, *In re Prudential Energy Co.*, 58 B.R. [857] at 862 [Bankr. S.D.N.Y.]; and 3) to promote the willingness of those who deal with post-confirmation debtors to extend the credit that such companies frequently need. *Id.*

*Id.* at 619.

A Bankruptcy Court in determining the feasibility of a proposed plan should "scrutinize the plan carefully to determine whether it offers a reasonable prospect of success and is workable." *In re Monnier Brothers*, 755 F.2d 1336, 1341 (8th Cir. 1985); *In re Pikes Peak Water Company*, 779 F.2d 1456, 1460 (10th Cir.1985).

The plan proponent is not required to guarantee the ultimate success of the reorganized company. *Id.; In re Wolf*, 61 B.R. 1010, 1011 (Bankr.N.D.Iowa 1986). However, the plan proponent is required to provide a "reasonable assurance of success." *In re Trail's End Lodge, Inc.*, 54 B.R. 898, 904 (Bankr.D.Vt.1985). As noted by the Court in *In re Prudential Energy Co.*, 58 B.R. 857, 862 (Bankr.S.D.N.Y.1986), the Code imposes upon the Court the responsibility to determine whether the requirements of § 1129(a) have been met even if no objections have been asserted; and although discharging this responsibili-

---

**3.** Snider testified that in 1987 the Debtor borrowed $80,000.00 from NIB for operating expenses, which it does annually from March through August, and repaid $65,000.00 thereof out of the sale of soybeans leaving a balance of $15,000.00 to be paid. Per Snider said loan floats with the prime rate and the rate of interest is in the range of 10.5% to 11.5%.

**4.** This figure would be $195,310.36 if the payments to unsecured creditors were reduced on an annual basis to $4,478.00 over five years. Reduction in annual trustee commission for payment to unsecured creditors would also be reduced from $748.22 to $447.80 further reducing total payments another $300.42 to $195,-009.94.

ty does not entail investigation of the Debtor, it does require the Court to require the Debtor to provide sufficient documentation and to ask appropriate questions.

The Court in *Prudential Energy* stated:

Guaranteed success in the stiff winds of commerce without the protection of the Code is not the standard under § 1129(a)(11). Most debtors emerge from reorganization with a significant handicap. But a plan based on impractical or visionary expectations cannot be confirmed. *Clarkson v. Cooke Sales and Service Co. (In re Clarkson)*, 767 F.2d 417, 420 (8th Cir.1985); 5 *Collier on Bankruptcy*, par. 1129.02 at 1129–34 (15th ed. 1985); *see also, Chase Manhattan Mortgage and Realty Trust v. Bergman (Matter of Bergman)* 585 F.2d 1171, 1179 (2d Cir.1978) (construing the feasibility requirement under Chapter XII of the former Bankruptcy Act, 11 U.S.C. § 872 (1976) (repealed)). All that is required is that there be reasonable assurance of commercial viability. *In re Trail's End Lodge, Inc.*, 54 B.R. [898] at 904 [Bankr.Vt.1985].

*Id.* at 862.

The Second Circuit has declared that the feasibility test contemplates an analysis of "the probability of actual performance of the provisions of the plan. Sincerity, honesty and willingness are not sufficient to make a plan feasible and neither are any visionary promises. The test is whether the things which are to be done after confirmation can be done as a practical matter under the facts." *In re Bergman*, 585 F.2d 1171, 1179 (2nd Cir.1978); *See also, In re Clarkson*, 767 F.2d 417, 420 (8th Cir. 1985).

■ When long term payments are contemplated stricter proof of feasibility is required. *In re Agawam*, 63 B.R. 612, 619 *supra*. There are often many pitfalls in plans that project long term payments and the longer period a Debtor contemplates to retire plan obligations, the more difficult it may be to prove feasibility. *In re White*, 36 B.R. 199, 203–04 (Bankr.D.Kan.1983).

■ The Court in scrutinizing the plan should consider (1) the adequacy of the Debtor's reorganized capital structure; (2) the earning potential of the industry; (3) general economic conditions; and (4) the ability of the Debtor's reorganized management/structure. *In re Adamson Co., Inc.*, 42 B.R. 169, 174 (Bankr.E.D.Va.1984); *In re Merrimack Valley Oil Co., Inc.*, 32 B.R. 485, 488 (Bankr.D.Mass.1983); *In re Landmark at Plaza Park, Ltd.*, 7 B.R. 653, 659 (Bankr.D.N.J.1980). The Court should also consider the prospective availability of credit and whether the debtor will have the future ability to meet its requirements for capital expenditures. *In re Prudential Energy Co.*, 58 B.R. at 863.

Similarly, as stated by the Court in *In re Merrimack Valley Oil Co., Inc.*:

The purpose of this requirement (§ 1129(a)(11)), which was adopted from the 1898 Bankruptcy Acts requirements of feasibility, is to ensure that the plan offers a reasonably workable prospect of success and is not a visionary scheme. *In re Landmark at Plaza, Ltd.*, 8 B.C.D. 1363, 7 B.R. 653 (Bankr.D.N.J.1980). In determining whether a plan passes the feasibility test, the Court should consider (1) the adequacy of the capital structure; (2) the earning power of the business; (3) economic conditions; and (4) the ability of management. L. King, 5 *Collier on Bankruptcy*, par. 1129.02 (15th ed. 1982 Supp.).

Where a debtor proposes to fund a plan out of operating revenue, its financial record during the pendency of the Chapter 11 is probative of feasibility. *See In re Northern Protective Services, Inc.*, 8 B.C.D. 1363, 19 B.R. 802 (Bankr. W.D.Wash.1982); *In re Western Management, Inc.*, 6 B.R. 438 (Bankr.W. D.Ky.1980). Income projections indicat-

ing financial progress must be based on concrete evidence of financial progress, and must not be speculative, conjectural or unrealistic predictions. *In re Stuart Motel, Inc.*, 8 B.R. 48, 7 B.C.D. 54 (Bankr.S.D.Fla.1980).

*In re Merrimack Valley Oil Co., Inc.*, 32 B.R. at 488. *See also, In re U.S. Truck Co. Inc.*, 800 F.2d 581 (6th Cir.1986); *In re Toy & Sports Warehouse, Inc.*, 37 B.R. 141, 151 (Bankr.S.D.N.Y.1984).

It is also inappropriate for the Court to confirm a plan that, "is so narrowly constructed, that any swing in the negative causes the plan to fail." *In re Cott*, 49 B.R. 570, 572 (Bankr.W.D.Mo.1985).

▮ The purpose of Chapter 12 is to promote the reorganization of family farmers and this Court endeavors to give the Chapter 12 Debtor the benefit of the doubt on the issue of feasibility provided that, "it appears reasonably probable that the farmer can pay the restructured secured debt over a reasonable period of time, at a reasonable rate of interest, in light of farm prices and farm programs as of the date of confirmation." *In re Ahlers*, 794 F.2d 388, 392 (8th Cir.1986).

In denying a Chapter 12 Debtor's plan on the grounds of the lack of feasibility, the Court in *In re Konzak*, 78 B.R. 990, 993–94 (Bankr.D.N.D.1987), stated as follows:

The standing Chapter 12 trustee recommends confirmation, however, it is apparent that even if the Debtors' projections are to be accepted, the margin for error is absolutely nonexistent. No evidence was presented on how future yields would consistently out perform the established yield figures. There was also no evidence produced establishing the heightened grain market prices ascribed to the future years production.

\*    \*    \*    \*    \*    \*

A debtor should not premise future plan cash flows upon heightened yield or market data for successive plan years unless there is some objective base for such data. The plan must, to the extent possible, be based on known inputs including yields, farm prices and programs as presently existing. No one can predict what prices will be in the future and it is folly to peg feasibility upon future yields and market prices which are at best often unpredictable and at worst even imaginary. This is particularly true where, as here, there is absolutely no margin of error built in for even minimal unforeseen expenses or reduced yields.

While this court will give a debtor the benefit of the doubt and will accept testimony bearing on the issue of what might be reasonably expected to happen to crop yields and grain prices in the future, such testimony should be based upon historical production figures, county averages, or ASCS proven yields. Market projections must be supported by some factual basis in order for them to be regarded by the court as anything more than wishful thinking. *In re Anderson*, 52 B.R. 159 (Bankr.D.N.D.1985). The determination of feasibility, even in Chapter 12 cases, cannot be made in a complete evidentiary vacuum but, as stated by the Eighth Circuit, "must be rooted in predictions based upon objective fact." *In re Clarkson*, 767 F.2d 417, 420 (8th Cir.1985); *see also, In re Hoff*, 54 B.R. 746 (Bankr.D.N.D.1985). The Debtors have failed to supply this court with sufficient information to allow a valid assessment of whether their future yield and income projections are within the realm of probability.

Projecting future farm income and expense is certainly not, "an exact science." *In re Monnier Brothers*, 755 F.2d 1336, 1341, *supra*. And there can be no doubt that "in a farm economy, projections over long periods of time are treacherous. Markets are subject to wide swings. Weather is never predictable. Government pro-

grams come and go." *In re Fursman Ranch,* 38 B.r. 907, 912 (Bankr.W.D.Mo. 1984). Nevertheless, in spite of the uncertainties related to farming, plans proposed by farmers may be found to be feasible and confirmable. *See In re Martin,* 66 B.R. 921 (Bankr.D.Mont.1986); *Matter of C & P Gray Farms, Inc.* 70 B.R. 704 (Bankr.W.D. Mo.1987).

■ In addition, some kind of cushion must be provided in the plan to make it feasible, whether it be a Chapter 11, 12 or 13. As the Court stated in *In re Otero,* 48 B.R. 704, 708 (Bankr.E.D.Va.1985);

> A cushion of money is necessary in Chapter 13 budgeting to guard against life's unexpectancies. It is not in the public interest to squeeze the last dollar from Chapter 13 debtors to fund a Chapter 13 plan.

As pointed out by the court in *In re Greer,* 60 B.R. 547, 553 (Bankr.D.Colo. 1986), a cushion may be *required* for compliance with § 1325(a)(6) as to feasibility, which requires confirmation of a plan if, *inter alia,* the debtor will be able to make all payments under the plan.

*Collier* in discussing expenses stated as follows:

> *It is also clear from the legislative history that the amount necessary for support of the debtor and the debtor's dependents must include a "cushion" for unexpected expenses. Many courts, in considering whether a plan is feasible under section 1325(a)(6) of the Code, have noted that a realistic budget must include some margin for such expenses.* The proposal resulting in the disposable income test specifically contemplated that the plan would allow the debtor sufficient income for living expenses as required by the feasibility standard.

5 *Collier on Bankruptcy,* par. 1325.08 (pp 1325–46–49) (L. King. 15th ed.) (Footnotes omitted) (Emphasis added).

The Court finds that this statement is certainly apropos as to at least family owned and operated businesses seeking confirmation under Chapter 11 and 12 also.

The Debtor has the burden of proof on all elements necessary to confirm a plan pursuant to 11 U.S.C. § 1325, including feasibility.

The Debtor at the evidentiary hearing presented no evidence whatsoever of its long term historical yields and prices back beyond its 1986 and 1987 figures. In addition, it provided no pro forma long range projections based on historical data or any assumptions based thereon by which the Court could reasonably find that the Debtor's prices and yields would so increase during the course of the plan that it could be reasonably found that the Debtor can generate sufficient operating revenue, net income, and thus a positive cash flow to fund its plan. In addition, the Debtor has not filed a monthly operating report as required by the Court's General Operating Order since August 17, 1087, which covered the month of July, 1987. The Court and the creditors should have had the benefit of these actual operating income and expense figures to assist it in ascertaining the feasibility of the plan.

■ Based on the evidence, the Court may not itself indulge in highly speculative and unduly optimistic assumptions, and is compelled to limit its findings as to feasibility on the evidence presented by the Debtor and Equitable.

■ The Court has evaluated the Debtor's actual income and expenses and based on several alternate assumptions as set out above, the hard numbers just aren't there. There was no evidence submitted by the Debtor from which the Court can reasonably find that the Debtor will continue to maintain the historically high yields obtained in 1987 as to corn or that the market will support prices in excess of those obtained in 1987 to reasonably expect that the Debtor will be able to pay all normal operating expenses and pay the plan payments as proposed. The Debtor by its own admission has not kept records as to what its yields and prices were back beyond 1986, the year before this case was commenced, and has not reported the same to the ASCS for some 8 to 10 years.

In addition, all that the Court, the Trustee, and the Creditors had before it as to feasibility was the oral testimony of Snider and its Amended Operating Statement filed on September 10, 1987. No written cash flow statements or pro forma projections based on assumed yields, prices and expenses and a reasonable and logical basis for such assumptions were provided whereby the Court, the Trustee, and the creditors could make any informed judgment as to the prospects of the Debtor being able to fund the plan. This burden is on the Debtor, and the Court need not try and prove the Debtor's case by sifting through a mass of unstructured figures to try and confirm a plan. Further, the Debtor has *de minimis* cash reserves. No room is left in the plan whatsoever for a reserve for contingencies and the replacement of equipment. It is difficult for the Court to assume that even if operating expense ratios would remain the same, there would not be a modest annual increase in expenses of two to four percent based on minimal inflationary forces. (No historical figures were given for expenses prior to 1987 by the Debtor nor were projections as to future expenses provided). The figures simply do not show as a practical matter that the Debtor has any reasonable prospects of performing as required under the plan no matter how sincere its intentions. Under all four scenarios as to projected income discussed by the Court above, the Debtor would have either a negative or close to a zero cash flow. The Court finds that the most reasonable projection for annual gross income is $183,913.25. Even if expenses were reduced to $195,012.89 by paying unsecured creditors over five years, the Debtor's negative cash flow on an annual basis would be a *minus* $11,099.64 [5]. Even if the Court changed its assumptions to the point where there was projected a slight positive cash flow, the plan is so tightly constructed that even the slightest increase in expenses or decrease in income would be fatal to the success of the plan.

IT IS THEREFORE

ORDERED, that the confirmation of the Debtor's Plan as modified is hereby DENIED.

---

5. The Debtor's Amended Plan as modified at paragraph 5.6 provides for the inclusion of income from custom farming which would allegedly increase the Debtor's cash flow by $6,000.00. The inclusion of this income would not generate a positive cash flow for the farm. Further, there is no evidence in the record that the Debtor would have the opportunity to so farm, the availability of equipment to so farm or the required expertise. Therefore, this provision is of little assistance without further support.