**In re A. Milton RAPE and Bonnie W. Rape, d/b/a Mil–Bon Farms, Debtors.**

**FARMERS HOME ADMINISTRATION and Farm Credit Bank of Columbia, Appellants,**

v.

**A. Milton RAPE and Bonnie W. Rape, d/b/a Mil–Bon Farms, Appellees.**

**No. C–C–89–0196–P.**
**Bankruptcy No. 88–00960–MRW–12.**

United States District Court,
W.D. North Carolina,
Charlotte Division.

Aug. 29, 1989.

Charles E. Lyons, Asst. U.S. Atty., Charlotte, N.C.

Thomas W. Waldrep, Jr., Womble Carlyle Sandridge & Rice, Winston–Salem, N.C., for appellants.

Robert L. Lindsey, Jr., Lindsey and Schrimsher, P.A., Charlotte, N.C., for appellees.

Wayne Sigmon, Gastonia, N.C., Trustee.

## ORDER

ROBERT D. POTTER, Chief Judge.

### I. PRELIMINARY STATEMENT

THIS MATTER is before the Court on an appeal from the bankruptcy court by the Farmers Home Administration ("FmHA")[1] and the Farm Credit Bank of Columbia ("FCB"), formerly the Farm Land Bank of Columbia.[2]

On September 22, 1988, A. Milton Rape and Bonnie W. Rape, doing business as Mil–Bon Farms, (the "Rapes") filed for protection under Chapter 12 of the Bankruptcy Code, 11 U.S.C.A. §§ 1201–1231 (West Supp.1989) (the "Family Farmer Bankruptcy Act of 1986" or the "Act").[3] On December 20, 1988, the Rapes filed a Chapter 12 plan of reorganization, which was followed by an amended Chapter 12 plan. On January 30, 1989, the Honorable Marvin R. Wooten, Chief United States Bankruptcy Judge for the Western District of North Carolina, conducted a hearing to determine whether the Rapes' amended Chapter 12 plan should be confirmed; the feasibility of the amended Chapter 12 plan was the only contested issue. The following witnesses testified at the hearing: (1) P. Wayne Sigmon, Esq. ("Sigmon"), the Chapter 12 trustee; (2) Bonnie Rape; (3) Milton Rape; (4) Thomas Morgan ("Morgan"), the County Executive Director for the United States Department of Agriculture, Agricultural Stabilization Conservation Service; (5) Max Matthews ("Matthews"), Vice–President of Piedmont Farm Credit, acting as agent for FCB; and (6) Michael Huskey ("Huskey"), Farm Program Specialist for FmHA. After receiving all of the evidence and entertaining the arguments of counsel, for the Rapes and for FmHA and FCB, Judge Wooten indicated that the Rapes' amended Chapter 12 plan would be confirmed. On February 17, 1989, Judge Wooten entered a written order confirming the Rapes' amended Chapter 12 plan. On March 2, FmHA filed its Notice of Appeal, and on March 3, 1989, FCB filed its Notice of Appeal. On April 5, 1989, Judge Wooten entered an amended order—containing findings of fact and conclusions of law, pursuant to Rule 52(a) of the Federal Rules of Civil Procedure—confirming the Rapes' amended Chapter 12 plan. FmHA and FCB are appealing from the bankruptcy court's April 5th amended order.

On April 17, 1989, FmHA and FCB filed their respective designations of the record

---

1. FmHA is an agency of the United States of America.

2. FCB is a corporation organized and existing pursuant to the laws of the United States of America.

3. "In the fall of 1986, the Congress enacted what became Chapter 12 of the Bankruptcy Code. This legislation created a special form of bankruptcy designed specifically for farmers and intended to meet a perceived crisis in the agricultural community." *Travelers Ins. Co. v. Bullington,* 89 Bankr. 1010, 1010 (M.D.Ga.1988) (citation omitted), *aff'd,* 878 F.2d 354 (11th Cir. 1989) ("Congress enacted Chapter 12 of the bankruptcy code to provide special relief for family farmers"). As one court has explained:

Chapter 12 was created by Congress because many family farmers ... cannot qualify under Chapter 13 because their debts exceed the statutory limits. 11 U.S.C. § 109(e). Further, the possible Chapter 11 relief to family farmers is often "needlessly complicated, unduly time-consuming, inordinately expensive and, in too many cases, unworkable." H.R.Conf. Rep. No. 99–958, 99th Cong., 2d Sess. 48 (1986), U.S.Code Cong. & Admin.News 1986, 5227, 5249. Chapter 12 is intended to "give family farmers facing bankruptcy a fighting chance to reorganize their debts and keep their land." *Id.* In Chapter 12, it is intended that family farmers will receive "important protection from creditors"; however, Chapter 12 is also intended to prevent abuse of the bankruptcy system and to ensure farm creditors will receive fair debt repayment treatment. *Id.* Under Chapter 12, Congress intended "it will be easier for a family farmer to confirm a plan of reorganization." *Id.*

*In re Pianowski,* 92 B.R. 225, 232 (Bankr.W.D. Mich.1988).

on appeal and statements of issues. On April 18, 1989, the Rapes filed their designations of the record on appeal and statement of issues. On May 1, 1989, the appeal was docketed in this Court, pursuant to Bankruptcy Rule 8007.

FmHA and FCB claim on appeal that: (1) the bankruptcy court's findings of material fact in support of its amended order confirming the Rapes' amended Chapter 12 plan are clearly erroneous; (2) the bankruptcy court failed to make findings of material fact that are supported by the record; and (3) the bankruptcy court erroneously concluded that the Rapes will be able to comply with the requirement of Section 1225(a)(6) of Title 11, United States Code—the feasibility test.

This Court has jurisdiction over the present action pursuant to Section 158(a) of Title 28, United States Code.

The parties have adequately presented in their briefs the relevant facts and legal arguments, and, therefore, this Court will dispense with oral argument because a decision can be made on the basis of the record and because oral argument would not significantly aid the decisional process. Bankr.Rule 8012; *Grundy Nat. Bank v. Shortt,* 80 B.R. 802, 803 (W.D.Va.1987).

For the reasons that follow, this Court will adopt the bankruptcy court's findings of fact and will affirm the bankruptcy court's amended order, which confirmed the Rapes' amended Chapter 12 plan.

## II. RELEVANT FACTS [4]

The Rapes are farmers; they grow soybeans, corn, and wheat in Union and Anson Counties, both of which are located in North Carolina. The Rapes receive their income primarily from selling their soybeans, corn, and wheat, but they have in the past also received income from the rental of their hog finishing house and from federal farm subsidiary programs.

Table One is a summary—generated from the Rapes' tax returns—indicating the general past profitability of the Rapes' farming operation:

Table 1

| Year | Farm Revenue | Farm Expenses | Farm Loss/Profit | Net Income Available to Pay Creditors |
|------|--------------|---------------|------------------|----------------------------------------|
| 1981 | — | — | ($227,431) | — |
| 1982 | — | — | — | — |
| 1983 | — | — | ($ 51,071) | — |
| 1984 | — | — | ($153,091) | — |
| 1985 | $163,955 | $261,656 | ($ 97,701) | ($ 36,326) |
| 1986 | $ 94,448 | $135,048 | ($ 33,900) | ($ 34,184) |
| 1987 | $143,303 | $135,366 | $ 7,935 | $ 17,432 |
| 1988 [5] | $209,587 | $177,696 | $ 31,891 | $ 31,891 |

As the above figures show, 1988 was the Rapes' best year, thus far. It is undisputed that they generated more revenue in 1988 than in any year since the 1970's. In 1987 and 1988, the Rapes' farming operation generated positive cash flow in part because they did not make any payments to FCB and FmHA, the two lenders holding approximately eighty-five percent (85%) of the Rapes' secured indebtedness.

**4.** If a district court affirms an order of a bankruptcy judge and adopts the bankruptcy judge's findings of fact, then the district court is not required to enter its own findings of fact. *See Chase Capital Corp. v. Bumb,* 336 F.2d 1000, 1001 (9th Cir.1964), *cert. denied,* 380 U.S. 934, 85 S.Ct. 941, 13 L.Ed.2d 821 (1965). The following factual recitation is offered simply as an aid to understanding.

**5.** The Rapes compiled the 1988 figures from their books and records. (Transcript at 6). References to the transcript of the January 30, 1989 hearing shall hereinafter appear as "Tr".

Table Two is an item-by-item breakdown of the Rapes' 1988 income and expenses— expressed in both the cash basis method of accounting and in the accrual basis method of accounting.

Table 2

| | | 1988 CASH BASIS | 1988 ACCRUAL BASIS |
|---|---|---|---|
| **INCOME** | Source | | |
| | Wheat | $ 25,407 | $ 25,407 |
| | Corn | 0 | $ 29,250 |
| | Soybeans | $ 1,328 | $ 62,000 |
| | Government Payments | $ 41,190 | $ 13,209 |
| | 1988 CCC Loan | $ 47,631 | — |
| | 1987 Crops | $ 83,421 | — |
| | Transfer from Savings | $ 2,000 | $ 2,000 |
| | Insurance Proceeds | $ 2,900 | $ 2,900 |
| | Interest Income | $ 142 | $ 142 |
| | Rental Income | $ 5,406 | $ 5,406 |
| | Insurance Dividend | $ 162 | $ 162 |
| | **TOTAL CASH AVAILABLE** | **$209,587** | **$140,476** |

**EXPENSES**

Operating Expenses (325 double crop acres,[6] 400 single crop acres):

| | 1988 CASH BASIS | 1988 ACCRUAL BASIS |
|---|---|---|
| Seed, Fert. & Chems. | $ 35,724 | $ 35,724 |
| Electricity | $ 1,014 | $ 1,014 |
| Building Insurance | $ 831 | $ 831 |
| Land Rental | $ 14,075 | $ 17,275 |
| Fuel | $ 5,758 | $ 5,758 |
| Equipment Repair | $ 13,776 | $ 13,776 |
| Labor | $ 8,540 | $ 8,540 |
| Miscellaneous | $ 948 | $ 2,748 |
| Taxes/Soc. Security | $ 8,527 | $ 8,527 |
| **TOTAL OPERATING EXPENSES** | **$ 89,193** | **$ 94,193** |

Debt Payments:

| | 1988 CASH BASIS | 1988 ACCRUAL BASIS |
|---|---|---|
| 1987 CCC Loan | $ 52,586 | — |
| NCNB | $ 1,210 | $ 1,210 |
| New Holland | $ 3,690 | $ 3,690 |
| **TOTAL DEBT PAYMENTS** | **$ 57,486** | **$ 4,900** |

Miscellaneous Expenses:

| | 1988 CASH BASIS | 1988 ACCRUAL BASIS |
|---|---|---|
| Family Living | $ 25,517 | $ 25,517 |
| Attorney's Fees | $ 5,500 | $ 5,500 |
| **TOTAL MISCELLANEOUS EXPENSES** | **$ 31,017** | **$ 31,017** |

Total Cash Outlays:

| | 1988 CASH BASIS | 1988 ACCRUAL BASIS |
|---|---|---|
| Total Operating Expenses | $ 89,193 | $ 94,193 |
| Total Debt Payments | $ 57,486 | $ 4,900 |
| Total Miscellaneous Expenses | $ 31,017 | $ 31,017 |
| **TOTAL EXPENSES/PAYMENTS** | **$177,696** | **$130,110** |
| Income | $209,587 | $140,476 |
| Expenses | $177,696 | $130,110 |
| **AMOUNT AVAILABLE TO PAY CREDITORS** | **$ 31,891** | **$ 10,366** |

---

**6.** In 1988, the Rapes farmed 725 acres, 325 acres of which were double-cropped. Double-cropping is when a farmer plants wheat and then plants soybeans on the same land. Double-cropping saves on fertilizer and helps to prevent loss of moisture, but it may also produce lower yields.

The payments to creditors required by the Rapes' amended Chapter 12 plan may be summarized as follows:

Table 3

| Creditor | Outstanding Balance | Term (Years) | Collateral | Annual Payment |
|---|---|---|---|---|
| FmHA | 16,500 | 25 | 1st D/T Howie Tract (29 acres) | $ 1,738.44 |
| FmHA | 19,500 | 25 | 1st D/T Howie Tract (25.5 acres) | $ 2,054.52 |
| FmHA | 11,254 | 25 | 2nd D/T on all other land | $ 1,400.00 |
| FmHA | 56,568 | 5 | Equipment | $ 9,079.18 |
| Trustee | | | Fee on above payment | $ 907.92 |
| Ford Motor Credit | 35,000 | 4.5 | Equipment | $ 9,845.16 |
| FmHa | | | Fee on above payment | $ 984.52 |
| NCNB | 21,000 | 5 | Equipment | $ 3,159.24 |
| FCB | 180,000 | 20 | 1st D/T Union County land | $27,824.18 |
| FCB | 36,846 | 20 | 1st D/T Union County land | $ 5,673.54 |
| FmHA | 750,000 | 4.5 | Deficiency | $ 500.00 |
| Trustee | | | Fee on above payment | $ 50.00 |
| Contingencies | | | | $ 783.30 |
| **TOTAL ANNUAL PROJECTED PLAN PAYMENTS:** | | | | **$64,000.00** |

Thus, the $64,000 question is whether the Rapes can make payments equal to at least $64,000 per year for the life of their amended Chapter 12 plan.[7] The bankruptcy court judge concluded that the Rapes could make all of the payments required by their amended Chapter 12 plan. If the Rapes fail to make a payment, the amended Chapter 12 plan explicitly provides, in pertinent part, the following:

In the event the [Rapes] fail to make a scheduled payment to a secured creditor or default[ ] in any other provision of the Plan and said default (either monetary or nonmonetary) is not cured within twenty (20) days of said default, the Trustee shall issue notice of sale to liquidate the assets of the [Rapes'] estate and shall proceed to liquidate said assets. In said event, the Trustee shall be entitled to fees and expenses (not including auctioneer's commission) equal to 10% of the gross proceeds of sale.

Amended Chapter 12 Plan at 8.

Table Four shows the approximate average price the Rapes received for corn, wheat, and soybeans over the last three years.

Table 4

| Crop | Price ($/bushel) |
|---|---|
| Corn | $3.00 |
| Wheat | $3.40 |
| Soybeans | $6.80–$7.00 |

7. The bankruptcy court noted that annual payments under the Rapes' amended Chapter 12 plan could be increased by as much as $4,179.77 per year for crop liens and $2,237.18 per year for pulpwood harvested by the Rapes, depending upon certain litigation expected to take place between the Rapes and FmHA. If FmHA prevails in the litigation, the total annual payments under the Rapes' amended Chapter 12 plan would be approximately $70,416.95. Plan payments could also increase or decrease due to variable interest rate fluctuations.

Table Five shows the Rapes' established yields for corn, wheat, and soybeans.

### Table 5

| Crop | Yield (bushel/acre) |
|------|---------------------|
| Corn | 77.44 |
| Wheat | 38.05977 |
| Soybeans | 27 |

It is important to note here that the above-listed yields were established when the Rapes were double-cropping wheat and soybeans.

Table Six shows the Rapes' projected yields, prices, and gross crop income:

### Table 6

| Commodity | Acres Planted | Projected Yield (bushel/acre) | Projected Price ($/bushel) | Projected Income |
|-----------|---------------|-------------------------------|----------------------------|------------------|
| Wheat | 425 | 38 | 4.25 | $ 68,637.50 |
| Corn | 300 | 77.5 | 3.05 | $ 70,912.50 |
| Soybeans | 750 | 27 | 7.20 | $145,800.00 |
| **PROJECTED TOTAL GROSS CROP INCOME** | | | | **$285,350.00** [8] |

---

Table Seven shows the Rapes' projected cash flow during the life of their amended Chapter 12 plan.

### Table 7

| CASH INFLOW | |
|-------------|--|
| Total gross crop income: | $285,350.00 |
| Hog house rental: | $ 6,000.00 |
| **TOTAL CASH AVAILABLE FROM FARM:** | **$291,350.00** |
| CASH OUTFLOW | |
| Farm operating expenses (1475 acres): | $120,000.00 |
| Plan Payments: | $ 64,000.00 |
| Family Living: | $ 25,517.11 |
| Taxes/Social Security: | $ 5,000.00 |
| **TOTAL CASH OUTLAYS:** | **$214,517.11** |
| ANNUAL CASH PROJECTION | |
| Total Cash Available: | $291,350.00 |
| Total Cash Outlays: | $214,517.11 |
| Cash Remainder: | $ 76,832.89 |
| Off-farm Income (to be earned by Bonnie Rape): | $ 6,000.00 |
| **CASH SURPLUS:** | **$ 82,832.89** |

---

Thus, Table Seven demonstrates that the Rapes will be able to make all of the required payments under the amended Chapter 12 plan, and still have a cushion equalling approximately $82,832.89.

In Table Eight the Rapes' projections are compared to the Rapes' actual 1988 production figures.

8. FCB states in its brief that "Mr. Matthews testified that such farm production by the Debtors is not possible. (Tr., p. 114)." An examination of page 114 of the transcript reveals that Matthews did not testify that the Rapes' projected farm production was "not possible." Matthews did agree that the Rapes have "never had a year approaching as good as th[e] projection," but he definitely did not state that the figures in the projection were unobtainable or impossible. This significant misrepresentation of the record by FCB is disturbing, to say the least.

Table 8

| Year | Single Crop Acres | Double Crop Acres | Total Acres | Total Crop Income | Total Crop Expenses | Expenses Expressed As a % of Income |
|------|------|------|------|------|------|------|
| 1988 | 400 | 325 | 1050 | $116,657 | $ 89,193 | 76.45% |
| 1989 | 625 | 425 | 1475 | $285,350 | $120,000 | 42.05% |

## III. APPLICABLE LAW

### A. *Standard of Decision*

The applicable standard of review on appeal to the district court from a judgment, order, or decree of the bankruptcy court is set out in Bankruptcy Rule 8013, which provides, in pertinent part, the following:

On an appeal the district court ... may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings. Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses.

Bankr.Rule 8013. When a district court reviews a bankruptcy court's judgment, it acts as an appellate court. *E.g., In re Eurele Farms, Inc. (Eurele Farms, Inc. v. State Bank In Eden Valley)*, 861 F.2d 1089, 1090 (8th Cir.1988). Thus, the district court reviews the bankruptcy court's findings of fact to determine whether they are clearly erroneous. A bankruptcy court's finding of fact is "clearly erroneous" when, although there is evidence to support it, the reviewing court, on the entire record, is left with the definite and firm conviction that a mistake has been committed. *E.g., In re Cook*, 72 B.R. 976, 980 (W.D.Mo.1987) (citing *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 541–542, 92 L.Ed. 746 (1948)). Alternatively, a bankruptcy court's finding of fact is "clearly erroneous" "when it is (1) not supported by substantial evidence; (2) contrary to the clear preponderance of the evidence; or (3) based upon an erroneous view of the law." *In re Bartlett (Federal Land Bank of Columbia v. Bartlett)*, 92 B.R. 142, 143 (E.D.N.C. 1988) (citing *In re Cook*, 72 B.R. at 980).

A district court reviewing a bankruptcy court's decision can consider only the evidence presented to the bankruptcy court and made a part of the record. *Id.* The district court may not make its own independent factual findings. *In re Euerle Farms, Inc. (Euerle Farms, Inc. v. State Bank In Eden Valley)*, 861 F.2d at 1090.

The party seeking reversal of the bankruptcy court's factual findings has the burden of persuasion. *In re Cook*, 72 B.R. at 980 (citing *Espiefs v. Settle*, 14 B.R. 280, 283 (D.N.H.1981) ("stringent" burden)). The appellant may not merely show that the bankruptcy court could have reached another conclusion based upon the testimony and evidence presented. *Espiefs v. Settle*, 14 B.R. at 283 (citing *In re Windor Indus., Inc.*, 459 F.Supp. 270, 275 (N.D. Tex.1978)).

On the other hand, the district court reviews the bankruptcy court's legal conclusions de novo to determine whether they are correct. *E.g., Travelers Ins. Co. v. Bullington*, 89 B.R. 1010, 1010–1011 (M.D. Ga.1988) ("as to conclusions of law this Court must make an independent determination of the accuracy of such conclusions"), *aff'd*, 878 F.2d 354 (11th Cir.1989).

### B. *Substantive Law*

A court may not approve a Chapter 12 plan unless certain statutorily specified prerequisites are met, including the following: The court must determine that "the debtor will be able to make all payments under the plan and to comply with the plan." 11 U.S.C.A. § 1225(a)(6) (West Supp.1989). This requirement is sometimes known as the feasibility test.[9] *E.g., In re Bartlett (Federal Land Bank of*

---

**9.** Feasible—the adjective form of the noun fea-

sibility—has been defined as "Capable of being

*Columbia v. Bartlett),* 92 B.R. at 144 ("Requiring the debtor to be capable of making such payments provides a feasibility test for confirmation."). "[F]easibility, which depends on a determination of the reasonable probability of payment, is fundamentally a fact question. Resolution of feasibility necessarily entails a determination of the comparative credibility of experts, as well as the credibility of the debtor." *In re Crowley,* 85 B.R. 76, 78–79 (W.D.Wis.1988). Thus, whether a debtor will be able to make payments under the terms of a Chapter 12 plan is a factual determination subject to the clearly erroneous standard of review set out in Bankruptcy Rule 8013. *In re Bartlett (Federal Land Bank of Columbia v. Bartlett),* 92 B.R. at 143 (citing *In re Cook,* 72 B.R. at 980). At the confirmation hearing, the Rapes bore the burden of proof on the feasibility issue. *See In re Adam,* 92 B.R. 732, 736 (Bankr. E.D.Mich.1988); *In re Zurface,* 95 B.R. 527 (Bankr.S.D.Ohio 1989). On appeal, however, the appellants have the burden of showing that the bankruptcy court's findings of fact vis-à-vis the feasibility issue are clearly erroneous.

Regrettably, the issue of feasibility is—and was below—sharply contested, as is typical in Chapter 12 cases. *See, e.g., In re Kloberdanz,* 83 B.R. 767, 772 (Bankr.D. Colo.1988).

Many courts have found that they should give a Chapter 12 debtor the benefit of the doubt regarding feasibility when the debtor's projections—using reasonable inputs in light of the current economic climate—indicate that it is reasonably probable that the debtors will be able to make the plan payments. *In re Konzak,* 78 B.R. 990, 993 (Bankr.D.N.D.1987); *In re Rott,* 94 B.R. 163, 169 (Bankr.D.N.D.1988); *see also In re Snider Farms, Inc.,* 83 B.R. 1003, 1013 (Bankr.N.D.Ind.1988) ("The purpose of Chapter 12 is to promote reorganization of family farmers and this Court endeavors to give the Chapter 12 Debtor the benefit of the doubt on the issue of feasibility provided that, 'it appears reasonably probable that the farmers can pay the restructured debt over a reasonable period of time, at a reasonable rate of interest, in light of farm prices and farm programs as of the date of confirmation.'" (quoting *In re Ahlers,* 794 F.2d 388, 392 (8th Cir.1986), *rev'd on other grounds,* 485 U.S. 197, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988))).

When confronted with a choice between projections reasonably based upon a debtor's historic data, or projections from a study including a broader geographic area, the more narrowly tailored projections are a better indicator of future performance. *In re Rott,* 94 B.R. at 170.

"The plan's ability to cash flow may be analyzed by comparing the income available to the payments required under the plan." *Id.*

"Feasibility is never certain, particularly in farm situations. It is an element of confirmation that is difficult to prove and equally difficult to decide." *In re Kloberdanz,* 83 B.R. at 773; *see also In re Snider Farms, Inc.,* 83 B.R. at 1006 ("the most difficult task"). "The Court is in effect required to predict based on the historical data provided by the parties and published sources, current conditions, and certain assumptions and projections made thereon, whether the Debtor 'will be able to make

done, executed, affected or accomplished. Reasonable assurance of success. See Possible." *Black's Law Dictionary* 549 (5th ed. 1979); *see also Webster's Ninth New Collegiate Dictionary* 453 (1988) ("capable of being done or carried out"). One leading lexicographer has explained feasible's proper use as follows:

Its proper sense is practicable, "capable of being done, accomplished, or carried out." That is, it means the same as *possible* in one of the latter's senses, and its true function is to be used instead of *possible* where that might be ambiguous.... The wrong use of feasible is that in which, by SLIPSHOD EX-

TENSION, it is allowed to have also the other sense of *possible,* and that of *probable.*
H.W. Fowler, *A Dictionary of Modern English Usage* 191–192 (2d ed. 1965) (emphasis in original). "The original meaning of *feasible* is simply doable (Lat. *facere* [=] do)." *Id.* at 562. Unfortunately, most courts considering Chapter 12 plans have used "feasible" and "probable" interchangeably. The discussion in the text explains that the § 1225(a)(6) "feasibility test" has developed so as to be not merely a "doability test"; it is, instead, a "reasonable probability test."

all payments under the plan and to comply with the plan.'" *Id.* (quoting 11 U.S.C. § 1225(a)(6)). Section 1225(a)(6) does not require an "iron clad guarantee." *In re Kloberdanz,* 83 B.R. at 773.

> The Court must be persuaded that it is *probable,* not merely possible or hopeful, that the Debtors can actually pay the restructured debt and perform all obligations of the plan. This requires consideration of the farm's earning power, capital structure, economic conditions, managerial efficiency, and whether the same management will continue to operate the farm.

*Id.* (citing *In re Clarkson,* 767 F.2d 417, 420 (8th Cir.1985), and *In re Konzak,* 78 B.R. 990 (Bankr.D.N.D.1987)). "Sincerity, honesty, and willingness are not sufficient to make the plan feasible, and neither are any visionary promises. The test is whether the things which are to be done after confirmation can be done as a practical matter under the facts." *In re Clarkson,* 767 F.2d at 420; *In re Bartlett (Federal Land Bank of Columbia v. Bartlett),* 92 B.R. at 144.

Bare agronomic feasibility is not all that is required to establish a feasible Chapter 12 plan. *In re Crowley,* 85 B.R. at 79. In addition, it is certainly true that if "the most optimistic view of the debtors' economic future, based on the debtors' own projections, shows that the debtors' projected income would be insufficient to make all of the plan payments in the first year, confirmation of the Plan must be denied." *In re Bartlett (Federal Land Bank of Columbia v. Bartlett),* 92 B.R. at 144.

## IV. DISCUSSION

This Court is firmly convinced that the bankruptcy court's findings of fact are not clearly erroneous and that the bankruptcy court's legal conclusions are substantially correct and are based upon the existing applicable law, discussed above. FCB and FmHA have written very thorough briefs in a valiant attempt to overturn the bankruptcy court's findings of fact. This Court is of the opinion, however, that FCB and FmHA are simply—and fundamentally—unhappy with the credibility determinations made by the bankruptcy court judge. FCB and FmHA are, in effect, arguing that this Court should overturn the bankruptcy court's decision because other facts—supporting FCB's and FmHA's position—could have been found. This Court may not, and will not, overturn the bankruptcy court's findings of fact merely because FCB and FmHA have managed to ferret out certain bits of testimony and evidence that could, taken together, support a conclusion on the feasibility of the Rapes' amended Chapter 12 plan different from the feasibility conclusion reached by the bankruptcy court judge.

This Court does not believe a point-by-point rebuttal of FCB's and FmHA's arguments will serve any useful purpose. A couple of points deserve some limited attention, however.

First, FCB and FmHA have argued at length that the Rapes' expense projections are too low and that the Rapes' income projections are too high. Relying upon the testimony of Morgan, Matthews, and Huskey, FCB and FmHA urge this Court to determine that the bankruptcy court's findings of fact on these matters are clearly erroneous. This Court has examined the relevant portions of the record and concludes that the bankruptcy court's findings of fact are supported by substantial evidence, despite the testimony of Morgan, Matthews, and Huskey. Morgan, Matthews, and Huskey all gave bleak predictions regarding prices, yields, and expenses, yet their testimony was not compelling and, for the most part, no more speculative than the Rapes' testimony.[10] For

---

10. FCB's and FmHA's witnesses testified that yields and prices could be substantially below the yields and prices the Rapes have projected. Nevertheless, the Rapes have built a substantial cushion into their income and expense projections, and, therefore, it is not necessary to quibble about the exact prices or yields that the Rapes will need to obtain to make their amended Chapter 12 plan work. The yields may be lower (or higher) and the prices may be higher (or lower); it suffices to say that the Rapes' projections are reasonable and based, at least in part, upon historical data.

example, Matthews and Huskey both testified that farm expenses should equal at least seventy-five percent (75%) of gross farm revenues. Neither witness acknowledged that reduced marginal costs may be achieved by expanding the size of the operation—the economy of scale. Yet, at least some courts have found that increases in revenue caused by increased yields may result in only thirty percent (30%) to thirty-five percent (35%) increases in seed, fertilizer, and harvest expenses. *See In re Snider Farms, Inc.*, 83 B.R. 977, 985 (Bankr. N.D.Ind.1988); *see also In re Snider Farms, Inc.*, 83 B.R. 1003, 1010 (Bankr.N. D.Ind.1988) ("each additional dollar of revenue is usually accompanied by 30 to 35 cents in increased costs"). FCB and FmHA's witnesses did not break down the Rapes' projected expenses into fixed and variable costs, and, therefore, they did not take into account that certain expenses— the fixed expenses—would be incurred regardless of whether the Rapes farmed on 1050 acres or 1475 acres.

The Rapes' expense projections are based upon their actual 1988 expense figures. FCB and FmHA argue that increases in gross farm revenues will necessarily result in directly proportional increases in farm expenses. Yet, it is more likely that increases in the amount of acreage farmed will result in increases in actual expenses that are directly proportional to the increased acreage. During the life of the amended Chapter 12 plan, the Rapes are planning to farm on approximately forty percent (40%) more land (1475 acres as compared to 1050 acres). Their projected expenses are based upon actual 1988 expenses which could be expected to recur. The Rapes incurred $89,192.81 in actual expenses when they farmed 1050 acres, and thus it is reasonable to predict that they will experience a forty percent (40%) increase in expenses (equalling approximately $124,869.93 in total farm-related expenses) when they attempt to farm on forty percent (40%) more land. Given the substantial cushion the Rapes have factored into their projections, this Court cannot say that the Rapes' projected expenses (equalling approximately $120,-000.00) are that far off mark.

■ Second, FmHA and FCB argue strenuously in their briefs that the bankruptcy court erred when it used—in the course of making the required feasibility determination—figures based on cash basis accounting rather than on accrual basis accounting. FmHA and FCB, however, fail to acknowledge that cash basis accounting should not be confused with a cash flow analysis, which simply measures the amount of cash received and the amount of cash expended by a business, or an individual, over a specific period of time. This Court is of the opinion that the bankruptcy court simply—and properly—used the cash basis accounting figures to develop figures useful for the necessary cash flow projections. As the bankruptcy court explained:

1. The Debtors' books and records are kept on a "cash" basis;
2. The Debtors are on the "cash" basis of accounting for federal income tax purposes;
3. The Debtors will be called upon to make their semi-annual payments under their [amended Chapter 12] Plan ... on a "cash" basis, and when it comes time to make the payments "accruals" such as accounts receivables and immature crops in the ground will be of no help to the Debtors in making the Plan payments; [and]
4. Bank deposits actually made and checks actually written in 1988 are the most concrete accounting facts the Court can avail itself of for the purpose of making future financing projections. These accounting facts must be considered with a host of other data ... to arrive at the actual future projections.

*In re Rape*, C–B–88–00960, slip op. at 11 (Bankr.W.D.N.C. April 5, 1989) (Amended Order Confirming Amended Chapter 12 Plan) [attached as an appendix, *infra*, p. 751, at p. 755]. While the accrual basis accounting figures may be more useful and more accurate in other contexts, such figures are not especially helpful to a court trying to make a determination as to the feasibility of a Chapter 12 plan.

Third, and finally, this Court is of the opinion that the bankruptcy court used the correct legal standard (discussed above) when determining the feasibility of the Rapes' amended Chapter 12 plan. The bankruptcy judge did make some findings of fact regarding the Rapes' credibility, ability, and candor, but such factual findings are perfectly appropriate. FCB and FmHA argue, in effect, that a court should not in any way base its determination of the feasibility issue upon intangible or subjective factors. Yet, the simple fact is that family farming is not an exact science; the success or failure of any one farm is largely dependent upon luck and upon the farmer's skill, resourcefulness, spirit, and grit. No one knows with any real certainty what tomorrow will bring. Many perils face family farmers: Recessions, depressions, droughts, hail storms, and even locusts. In the face of such possible perils, certainly it is not error for a court to consider, along with the hard numbers, the human factor, which may be the deciding factor when fortune—or nature—works against the efforts of the farmer. The Rapes' income and expense projections show that their amended Chapter 12 plan is feasible. The bankruptcy court judge simply found, in addition, that the Rapes are the kind of people who can actually make their plan work.

It may come to pass that the Rapes have a "tough row to hoe" to make their amended Chapter 12 plan work, but—as things stand now—they have at least a reasonable probability of success. If the Rapes fail to make any of the required payments or fail to comply with any of the other terms of their amended Chapter 12 plan, then FCB and FmHA will not be in a position substantially worse than the position they would be in right now if this Court were to order immediate liquidation.

## V. CONCLUSIONS

NOW, THEREFORE, IT IS ORDERED that the bankruptcy court's findings of fact—contained within its amended order, filed April 5, 1989—are *ADOPTED* and that the bankruptcy court's conclusions of law are *AFFIRMED.*

APPENDIX

United States Bankruptcy Court

for the Western District of
North Carolina

Charlotte Division

Case Number C–B–88–00960

Filed April 5, 1989

In re: A. Milton Rape and wife, Bonnie
W. Rape, Individually and d/b/a
Mil–Bon Farms, Debtors.

Employer I.D. No. 56–1167070

His S.S.A.N. 242–56–4245

Her S.S.A.N. 244–58–6207

AMENDED ORDER CONFIRMING
AMENDED CHAPTER 12 PLAN

This Amended Order Confirming the debtors' Amended Chapter 12 plan is hereby entered by and with the consent and at the request of the interested parties all as of record herein, after notice and hearing.

The Plan under Chapter 12 of the Bankruptcy Code filed by A. Milton Rape and wife, Bonnie W. Rape, Individually and d/b/a Mil–Bon Farms, on December 20, 1988, as amended and modified on the 16th day of February, 1989, having been timely and properly transmitted to creditors and appropriate parties in interest; and it having been determined after appropriate notice and hearing:

A. The Court makes the following FINDINGS OF FACT, from the records herein and in accord with the stipulations of the interested parties:

1. That the provisions of Chapter 12 of the Code and other applicable provisions of the Code have been complied with; and that the Plan has been proposed in good faith and not by any means forbidden by law; and

2. Any fees, charges, or amounts required of the Debtors by applicable law or the Plan have been or will be paid before the effective date of the Plan; and

3. The value, as of the effective date of the Plan, of property to be distributed under the Plan on account of each allowed claim or interest is not less than the amount that would be paid on such claim or interest if the estate of the Debtors was liquidated under Chapter 7 of the Bankruptcy Code on such date; and

4. With respect to each allowed secured claim provided for by the Plan:

(a) The holder of such claim has accepted the Plan; or

(b)

(i) The Plan provides that the holder of such claim retain the lien securing such claim; and

(ii) The value, as of the effective date of the Plan, of property to be distributed under the Plan on account of such claim is not less than the allowed amount of such claim; or

(c) The Debtors will surrender the property securing such claim to such holder.

5. The Debtors will be able to make all payments under the Plan.

6. The Chapter 12 Trustee has reviewed the Plan and recommends that it be confirmed.

B. The court makes the following *FINDINGS OF FACTS* from the record of the Confirmation Hearing held herein; at the request and with the consent of the interested parties:

1. At the beginning of the confirmation hearing, the Debtors' attorney handed out an Amended Chapter 12 Plan, all terms of which Farmers Home Administration (hereinafter "FmHA") and Farm Credit Bank (hereinafter "FCB") agreed to. That Amended Plan was not yet formally filed because it called for a fixed rate of interest on the restructured FCB loan whereas the Debtors having been given the option of a fixed rate or a variable rate by FCB, decided upon a variable rate of interest (at FCB's prevailing rates). The Amended Plan which was formally filed herein on February 17, 1989, was the same Plan handed out at the Confirmation hearing, except it contained the wording supplied by FCB for a variable rate loan as opposed to a fixed rate loan.

2. All parties and their respective counsel, agreed in open Court that the Debtors and their Plan have met all of the requirements of Section 1225 of the Bankruptcy Code for the Confirmation with the exception of feasibility (Section 1225(a)(6) and that the sole issue for determination by the Court was feasibility.

3. A. Milton Rape and Bonnie W. Rape (hereinafter the "Debtors") reside at 622 Walters Mill Road, Monroe, North Carolina.

4. Farmers Home Administration (hereinafter "FmHA") is an agency of the United States of America.

5. The Farm Credit Bank of Columbia (hereinafter "FCB") is a corporation organized and existing pursuant to the laws of the United States of America, with its principal place of business at 1401 Hampton Street, Columbia, South Carolina.

6. The Debtors' filed a voluntary petition under Chapter 12 of the Bankruptcy Code on September 22, 1988.

7. On January 27, 1989, the Debtors filed an amended plan of reorganization (hereinafter the "Plan") that requires the Debtors to pay $64,000 annually to creditors in years one through five (Debtors' Exhibit No. 1, p. 1), $39,586 annually to creditors in years six through twenty, and $4,979 annually to creditors in years twenty-one through twenty-five.

8. The Plan will require the Debtors to pay approximately $64,000 per year in debt service and in Trustee's fees. The aforesaid annual amount could be increased by as much as $4,179.77 per year for crop liens and $2,237.18 per year for pulpwood harvested by the Debtors, depending upon the outcome of certain litigation expected to take place herein between the Debtors and FmHA. In the latter event, the total annual payments under the Plan would be approximately $70,416.95. Plan payments could also increase or decrease due to variable interest rate fluctuations.

9. On January 27, 1989, FCB and FmHA filed a joint objection to the Plan, which objection was based primarily on the alleged lack of feasibility of the Plan.

10. On January 30, 1989, this Court held a hearing on the confirmation of the Plan.

11. The debtors introduced their "Exhibit # 1" into evidence which is a summary of projected Plan Payments (page 1), actual 1988 income, for each month (pages 2 and 3), Summary of Cash Received From Farming Operations in 1988, by source category (page 4), Projected Farm Expenses for 1989, based on actual 1988 figures (page 5), 1989 Projections (page 6), Actual 1988 Expenses by Category (page 7).

12. The Court finds the aforesaid Debtors' "Exhibit # 1" to be correct in every respect except for: (1) typing errors which caused the items under August, 1988, income (page 3) to be mislabeled, *to wit:* the $25,758.48, August figure was mislabeled "Government Payment" and should have been labeled "Soy Beans", the $11,556.16 August figure was mislabeled "Hog House Rent" and should have been labeled "Wheat" and the $2,900.00 August figure was mislabeled "Wheat" and should have been labeled "Insurance Proceeds (Lightning Damage)" and (2) Projected Annual Plan Payment while presently correct at $64,000.00, could rise as set out above. (See Finding No. 6 above). Debtors' "Exhibit # 1" as above corrected is hereby incorporated into this Finding of Fact in its entirety.

13. According to available tax records, the Debtors' financial history may be summarized as follows:

| Year | Farm Revenue | Farm Expenses | Tax Returns Loss/Profit | Net Income Available to Pay to Creditors [1] |
|------|--------------|---------------|-------------------------|-----------------------------------------------|
| 1981 | — | — | ($227,431) | — |
| 1982 | — | — | — | — |
| 1983 | — | — | ($ 51,071) | — |
| 1984 | — | — | ($153,091) | — |
| 1985 | 163,955 | 261,656 | ($ 97,701) | ($36,326    ) |
| 1986 | 94,448 | 135,048 | ($ 33,900) | ($34,184    ) |
| 1987 | 143,303 | 135,366 | $   7,935 | $17,432 |

14. The Debtors last payment to FCB was in 1985 and the Debtors last payment to FmHA was on January 10, 1986.

15. In 1988, the Debtors had gross revenue from farming in the amount of $204,286.94.

16. In 1988, the Debtors had farming expenses of $89,192.81, actually paid out and another $5,000.00, in current accounts payable at the end of 1988, for a total expenses in 1988 of $94,192.81.

17. In 1988, the Debtors had family living expenses of $25,517.11.

18. When the aforesaid farm expenses and family living expenses are subtracted from $204,286.94, $84,577.02, is left out of which to pay the projected Plan payments, and assuming that Plan payments total $70,416.95, per year, this leaves a difference of $14,160.07 as a cushion.

19. The female Debtor is a licensed real estate broker and is employed outside the home as a part-time real estate sales person and is also employed as a computer programer on a part-time basis.

20. A further cushion would be the $9,000.00 to $15,000.00 per year income of Mrs. Rape from real estate sales and part-time computer programing. Mrs. Rape had already received $1,500.00, in real estate commissions in 1989 as of January 30, 1989.

21. Debtors received $40,789.88, in government payments in 1988. It is ex-

---

**1.** Total gross income less operating expenses less living expenses less taxes, social security, and legal expenses equals net income available to pay creditors.

pected that these payments will be sharply reduced or completely omitted in 1989, however, since the receipt of the payments is based upon *not* planting crops, the Debtors will in fact plant crops to take the place of the phased out government programs and there should be no net loss in farm revenue.

22. Without any government programs, Debtors project and the Court finds as a fact for the purposes of this hearing, that 1989 and future years' crops will yield the following and be sold for the following prices:

| COMMODITY: | ACRES PLANTED: | YIELD PER ACRE: | PRICE PER BUSHEL: | AMOUNT |
|---|---|---|---|---|
| Wheat | 425 | 38 bu | 4.25 | $ 68,637.50 |
| Corn | 300 | 77.5 bu | 3.05 | 70,912.50 |
| Soy Beans | 750 | 27 bu | 7.20 | 145,800.00 |
| Hog House Rental | | | | 6,000.00 |
| TOTAL CASH AVAILABLE PER YEAR: | | | | $291,350.00 |

23. It should be noted that while the above shows a total of 1,475 acres planted, the actual number of acres is 1,025 because the 425 acres used for wheat will be "double cropped" and also be used to raise 425 acres of soy beans.

24. On the basis of the above, the Debtors project $291,350.00, in gross farm revenue.

25. Because of the increased number of acres being planted, Debtors' farming expenses will rise from the aforesaid $94,192.81, to from $110,000.00, to $120,000.00.

26. Taking the above $291,350.00, and $120,000.00, in farming expenses and $25,517.11, in family living expenses, there still remains $145,832.89, which is ample for paying the projected Plan payments.

27. The Debtors are experienced professional farmers. Mr. Rape was raised on a farm and had farming experience helping his father. In 1970, Mr. Rape and his father went into the farming business together and since 1975, Mr. and Mrs. Rape have farmed on their own.

28. 1988 was slightly above average, but the Rapes have had much better years than that during the 1970's.

29. Mrs. Rape has kept an excellent set of books and records and was able to accurately answer virtually every question put to her regarding the books and records of the subject farming operation.

30. Both of the Debtors are generally in good health.

31. Mr. Rape works a long day on the farm, always six (6) days per week and sometimes seven (7) per week.

32. Mr. Rape does most of his own repairs on farm equipment.

33. Farm commodity prices are projected to be higher in 1989 than in 1988.

34. At the beginning of 1988, Debtors had approximately $1,583.00, in cash on hand and approximately $5,120.00 in unpaid 1987 bills.

35. At the beginning of 1989, Debtors had approximately $30,118.00, in cash on hand and approximately $5,000.00 in unpaid 1988 bills. The cash difference is earmarked for getting the 1989 crops in the ground.

36. Also, Debtors have equity of from $30,000.00, to $38,000.00, (depending on future market prices) in stored crops (over and above commodity loans) at least some of which can be released for use in producing their 1989 crops.

37. Debtors' suppliers were all paid in full at the time of the filing of the original Petition herein.

38. The only other unsecured creditor that Debtors have in this Chapter 12 case besides FmHA is NCNB in the approximate amount of $1,350.00.

39. Debtors' farm income comes from wheat, corn and soy beans and from hog house rent of about $500.00 per month.

40. Debtors project that 1989–1993 will be as good or better financially than 1988,

and in addition, the Debtors project that the female Debtor will bring in from $9,000.00 to $15,000.00 per year from her aforesaid endeavors. The Court finds as a fact that these projections are reasonably reliable.

41. Debtors have implemented certain programs to increase farm income and to decrease farm expenses, such as planting more sod, which saves fuel bills and also conserves moisture during dry years. The Debtors do practically all of the farm labor themselves with the help of a part-time man at planting and harvest time. Debtors have "double cropped" (one crop followed by another on the same land) to save fertilizer. Debtors have discontinued farming operations on marginal land; Debtors have engaged in more crop rotation to get the maximum benefits of fertilizer and other chemicals.

42. Wayne Sigmon, Standing Chapter 12 Trustee testified that subjectively Mr. and Mrs. Rape impressed him as being among the most knowledgeable Chapter 12 Debtors he had seen, and that in his opinion, this Chapter 12 case had a better chance of succeeding than many of the other cases in which he is Trustee. Mr. Sigmon also noted that the vast majority of the Chapter 12 Debtors have been making their payments as called for by their respective Plans.

43. Likewise, the Court was impressed with the demeanor of both Debtors as witnesses and found them to be quite candid in their testimony and knowledgeable of farming operations in general and of their own operation in particular. The Court found the Debtors to be professional farmers who are likely to succeed in their Plan herein.

44. Based on all of the foregoing facts, the Court finds as a fact that the Debtors will be able to make all payments under the Plan and to comply with the Plan.

Based upon the above findings of fact, the Court makes and finds its CONCLUSIONS, as follows:

1. The Court interprets the feasibility requirements of Section 1225 of the Bankruptcy Code to mean, whether it is probable that the Debtors will be able to make all of the payments required by the Plan and to otherwise comply with the Plan.

2. In order to make the determination of whether or not the Debtors will be able to make the payments called for in the Plan, the Court must make projections of Debtors' future income and expenses.

3. In making the required projections, the Court finds and concludes that the prospective method of projection, when coupled with the historical data for the most recent year, is the better approach than a strictly historical approach. Congress certainly intended for Chapter 12 to give relief to farmers.

4. The Court has carefully considered whether to use the "cash" method of accounting or the "accrual" method of accounting in making the required projections and has decided upon using the "cash" approach in this case for the following reasons:

1. The Debtors' books and records are kept on a "cash" basis;

2. The Debtors are on the "cash" basis of accounting for federal income tax purposes;

3. The Debtors will be called upon to make their semi-annual payments under their Plan herein on a "cash" basis, and when it comes time to make the payments "accruals" such as accounts receivables and immature crops in the ground will be of no help to the Debtors in making the Plan payments;

4. Bank deposits actually made and checks actually written in 1988 are the most concrete accounting facts the Court can avail itself of for the purpose of making future financing projections. These accounting facts must be considered with a host of other data (hereinafter outlined, among these Findings of Fact) to arrive at the actual future projections.

5. The Court recognizes that the Debtors have had several bad years as disclosed by the Debtors' Federal Income Tax Returns in the years 1981 through 1987,

which are summarized in the record herein, however, it is noted that approximately $500,000.00, of the losses on said income tax returns is for depreciation according to the testimony of Max Matthews of FCB.

6. Because of the vast number of market, weather and economic variables, there is no way of determining what projections to make beyond the next few years and no farmer would ever be able to make such projections, and no such projections are required for finding a Plan to be feasible.

7. Prior to the enactment of Chapter 12 of the Code, many farmers insisted that the past actions of the Government in addicting them to government support and money in their farming operations should be a sufficient basis upon which to grant relief under Chapter 11 of the Code or to deny relief from the automatic stay under section 362. The courts consistently denied favorable action on such contentions. Apparently Congress, at least in part, were responding to such concerns when it enacted Chapter 12 to afford greater relief than that afforded by the then existing law. If the courts rely *exclusively* upon historical data, as requested by the Government herein, the net effect would be to deny Chapter 12 relief to the great majority of farmers in need thereof.

8. The Court concludes that the debtors' plan and projections are feasible and reasonable. Farmers in need of Chapter 12 relief have all sustained substantial periods of losses, under the present system of governmental farm supports, prior to any need for relief afforded thereby. To refuse to accept reasonable projections as herein, and/or to rely on historical data, as insisted on by the Government, would effectively deny Chapter 12 relief to distressed farmers. Congress was aware, when it enacted this relief for farmers, of the many support programs available and their administration, and thereby apparently desired to afford this last measure of relief as against governmental agencies, as well as the private sector. The foundation for relief, in a case such as this one, is the reasonableness of projections and thereby the plans feasibility, as herein found.

IT IS ORDERED THAT:

1. The Plan of Reorganization filed by A. Milton Rape and wife, Bonnie W. Rape, Individually and d/b/a Mil–Bon Farms, on December 20, 1988, as amended and modified on the 16th day of February, 1989, a copy of which is attached hereto, is confirmed.

2. The Debtors shall submit future income and property to the supervision and control of the Trustee as the Trustee shall direct for the period set out in the Plan.

3. The Trustee shall be paid as provided for in the Plan, subject to allowances and further Orders of this Court.

4. The Debtors shall make regular accountings as directed by the Trustee to the Trustee, and/or the Clerk, and such other parties as may be directed by the Trustee.

5. The Debtors shall serve a copy of this Order and the Plan on all creditors and other parties in interest within five (5) days of the entry of this Order and shall file a Certificate of Service for the same with the Clerk.

(s) Marvin R. Wooten
United States Bankruptcy Judge

EXHIBIT B

AMENDED CHAPTER 12 PLAN

Filed Feb. 16, 1989

The Debtors propose the following Plan for adjustment of their debts pursuant to Chapter 12, Title 11, United States Code:

A. DEFINITIONS: All terms herein shall have the definitions used in the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure and the Local Rules of the United States Bankruptcy Court for the Western District of North Carolina. The term "Debtor" shall have a singular or plural meaning as applicable.

B. SUBMISSION OF INCOME: Except as specifically provided hereafter, the Debtors shall pay to the Trustee such portion of their earnings and other future income as is necessary for the execution of this Plan,

and all of Debtors' disposable income is hereby submitted to the Plan.

C. VESTING OF ASSETS: Except as hereafter specified in the Plan, confirmation of this Plan vests all of the property of the estate in the Debtors, free and clear of any claim or interest of any creditor provided for by the Plan.

D. CLASSIFICATION AND TREATMENT OF CREDITORS: Creditors holding claims shall be classified and treated as set forth hereinafter:

1. *Priority Claims:* Each claim of the kind specified in Section 507(a)(7) of the Bankruptcy Code shall be paid in monthly installments outside the Plan, over a period equal to six (6) years from the date of the assessment of the claim. Said monthly payments shall begin thirty (30) days after the confirmation date and shall include interest as prescribed under Internal Revenue Service Code Section 6621, as to Federal taxes and interest as prescribed by applicable statutes as to all other taxes.

2. *Secured Claims:*

I. Farm Credit Bank of Columbia (hereinafter "FCB"), successor in interest to the Federal Land Bank of Columbia.

2. The FCB claim in the amount of $180,711.23, shall be secured by a first lien on all of Debtors' Union County, North Carolina, real property, except for the "Howie" tracts. The FCB claim shall be reamortized at a variable rate of interest for twenty (20) years with semi-annual payments of principal and interest to be made outside the Plan. The semi-annual payments shall be due on July 15, and January 15, òf each year, beginning on July 15, 1989. The rate of interest shall increase or decrease from time to time in such amounts as determined by the Board of Directors of FCB in accordance with the Farm Credit Act of 1971 and the regulations of the Farm Credit Administration, as the same now provide or may by amendment or revision thereafter provide. The current rate of interest on the above claim is 14.5%, and the amount of the Debtor's

semi-annual payment, based on the current rate of interest, is $13,949.26. The amount of the Debtor's payment on this claim is subject to change when the rate of interest changes. The Debtors will also pay to FCB $1,000.00 per month on the first (1st) day of March, April, May and June, 1989, which sums shall be applied to the payment due on July 15, 1989. FCB shall retain its lien on the subject collateral and all of its loan documents are hereby incorporated into this Plan by reference and FCB shall retain all of its rights and remedies set forth therein.

b. The FCB claim in the amount of $36,-825.95, shall be secured by a first lien on all of the Debtors' farmland located in Anson County, North Carolina. The FCB claim shall be reamortized at a variable rate of interest for twenty (20) years with semi-annual payments of principal and interest to be made outside the Plan. The semi-annual payments shall be due on July 15, and January 15, of each year, beginning on July 15, 1989. The rate of interest shall increase or decrease from time to time in such amounts as determined by the Board of Directors of FCB in accordance with the Farm Credit Act of 1971, and the regulations of the Farm Credit Administration, as the same now provide or may by amendment and revision thereafter provide. The current rate of interest on the above claim is 14.5%, and the amount of the Debtors' semi-annual payment, based on the current rate of interest, is $2,844.35. The amount of the Debtors' payment on this claim is subject to change when the rate of interest changes. FCB shall retain its lien on the subject collateral and all of its loan documents are hereby incorporated into this Plan by reference and FCB shall retain all of its rights and remedies set forth therein.

II. Farmers Home Administration.

a. 29 acre, Howie Property Tract ($16,-500.00) (first lien). The fair market value of this property has been determined by the Court to be $16,500.00. The Debtors propose to pay said $16,500.00 secured indebtedness outside the Plan, with interest thereon at 9.5% per annum, in fifty (50) semi-annual payments of $869.22, each on

July 15, and on January 15 of each year, beginning July 15, 1989. Farmers Home Administration shall retain its lien on the subject collateral and all of its loan documents are hereby incorporated into the Plan by reference and Farmers Home Administration shall retain all of its rights and remedies set forth in said documents.

b. 25.5 acre Howie Property Tract ($19,-500.00) (first lien). The fair market value of this property has been determined by the Court to be $19,500.00. The Debtors propose to pay said $19,500.00, secured indebtedness outside the Plan with interest thereon at 9.5% per annum, in fifty (50) semi-annual payments of $1,027.26 each, on July 15, and on January 15 of each year, beginning July 15, 1989. Farmers Home Administration shall retain its lien on the subject collateral and all of its loan documents are hereby incorporated into this Plan by reference and Farmers Home Administration shall retain all of its rights and remedies set forth in said documents.

c. All other land of the Debtor ($11,-254.00) (second lien). The Debtors' interest in the real property in this category has a fair market value of $221,500.00, plus $7,300.00 for Federal Land Bank stock hypothecated with Federal Land Bank for a total value of $228,800.00. From the aforesaid $228,800.00, must be deducted the exact amount of the secured claim of Federal Land Bank on the date of Confirmation of this Plan. The secured claim of Federal Land Bank is estimated at $217,546.00, which would leave a secured claim for Farmers Home Administration, in this category, of $11,254.00. The aforesaid $11,-254.00, is to be diminished dollar for dollar as and to the extent the Federal Land Bank claim exceeds $217,546.00. The Debtors propose to pay this secured claim of Farmers Home Administration, in whatever amount, (not to exceed $11,254.00) outside the Plan, with interest at 9.5% per annum, in fifty (50) equal semi-annual payments on July 15, and January 15 of each year, beginning July 15, 1989. Farmers Home Administration shall retain its lien on the subject collateral and all of its loan documents are hereby incorporated into this Plan by

reference and Farmers Home Administration shall retain all of its rights and remedies set forth in said documents.

d. *Farm Equipment.* ($56,568.00) (Being all of Debtors' farm equipment except for equipment upon which Ford Motor Credit Corporation and NCNB National Bank of North Carolina claim first liens). The Debtors' interest in this property has a fair market value of $56,568.00. The Debtors propose to pay this secured debt with interest at 10% per annum in semi-annual installments in the amount of $4,539.59 each, plus a $453.96 Trustee's fee, beginning on July 15, 1989, with subsequent payments in said amounts on the January 15th and on July 15th of each year, with a final balloon payment due on January 15, 1994, at which time all unpaid principal and interest shall be due and payable in full, outside the Plan, without Trustee's fees. Farmers Home Administration shall retain its lien on the subject collateral and all of its loan documents are hereby incorporated into the Plan by reference, and Farmers Home Administration shall retain all of its rights and remedies set forth in said documents.

e. *Crops.* Some of the Debtors' 1988 crops were planted prior to the Petition date herein, and Farmers Home Administration will be entitled to some percentage of the proceeds of some of Debtors' 1988 crops. If this amount cannot be agreed upon, it will be presented to the United States Bankruptcy Court for determination at a hearing upon due notice to all creditors and other parties in interest. The Debtors propose to pay this secured debt with interest at 10% per annum in semi-annual installments (plus a 10% Trustee's fee) amortized over a ten year period, said installments beginning on July 15, 1989, with subsequent payments being due on the 15th of each January and July, with a final balloon payment being due and payable on January 15, 1994, at which time all unpaid principal and interest shall be due and payable in full, outside the Plan, without Trustee's fees.

f. Pulpwood cut by Debtors ($13,938.32) Farmers Home Administration shall have thirty (30) days from the date of confirma-

tion to file an Adversary Proceeding seeking to determine whether or not $13,938.32 of Debtors' indebtedness to Farmers Home Administration is non-dischargeable due to Debtors' harvesting and selling of $13,938.32, in pulpwood from the "Howie Property" upon which Farmers Home Administration holds a first lien. In the event the Court should rule that all or any part of said $13,938.32, is non-dischargeable, then the non-dischargeable amount shall be paid to Farmers Home Administration outside the Plan, with interest thereon at the rate of 10% per annum in semi-annual installments amortized over a ten year period, said installments beginning on July 15, 1989, with subsequent payments being due on the 15th day of each January and July, with a final balloon payment being due and payable on January 15, 1994, at which time all unpaid principal and interest shall be due and payable in full outside the Plan.

III. Ford Motor Credit Company's ($35,000.00) secured claim is $35,000.00, secured by Debtors' New Holland TR–85 Combine and Grain Header attachment. The Debtors propose to pay this secured debt with interest thereon at 8.9% per annum in nine (9) semi-annual installments in the amount of $4,922.58 each, plus a $492.26 Trustee's fee, beginning on July 1, 1989, with subsequent payments in said amounts on the first day of January and the first day of July of each year. Ford Motor Credit Company has agreed not to file an unsecured claim in this Chapter 12 case. Ford Motor Credit Company shall retain its lien on the subject collateral and all of its loan documents are hereby incorporated into the Plan by reference and Ford Motor Credit Company shall retain all of its rights and remedies set forth in said documents.

IV. NCNB National Bank of North Carolina's security ($21,000.00) is valued as follows: 1984 John Deere 7000 Conservation Planter: $5,500.00; John Deere Split Row Attachment (5 row): $4,000.00; John Deere 200 Monitor System: $1,000.00; 1981 Massey Ferguson Corn Header: $7,500.00, and 1969 Ford Dump Truck: $3,000.00, for a total of $21,000.00. The Debtor will abandon to NCNB National Bank of North Carolina the following property valued as follows: 1976 Massey Ferguson 760 Combine valued at $14,000.00, and a 1974 John Deere 555 Crawler valued at $15,000.00. The Debtors propose to pay the aforesaid $21,000.00 secured claim with interest at 8.5% per annum in twenty (20) semi-annual payments, outside the Plan, of $1,579.62 each, beginning on July 1, 1989, with subsequent payments in said amount on the first day of January and on the first day of July of each year thereafter. NCNB shall retain its lien on the subject collateral and all of its loan documents are hereby incorporated into this Plan by reference and NCNB shall retain all of its rights and remedies set forth in said documents. In the event NCNB's lien should be determined to be inferior to that of Farmers Home Administration, the Farmers Home Administration shall have the benefit of the valuation provisions of this paragraph to the extent that its lien is superior to that of NCNB, and the payments to NCNB shall be reduced accordingly. In the latter event, amounts due Farmers Home Administration shall be paid, outside the Plan, with interest thereon at the rate of 10% per annum in semi-annual installments, amortized over a ten year period, said installments beginning on July 15, 1989, with subsequent payments being due on the 15th day of each January and July, with a final balloon payment being due and payable on January 15, 1994, at which time all unpaid principal and interest shall be due and payable in full, all outside the Plan. NCNB National Bank of North Carolina shall file an Adversary Proceeding within thirty (30) days of the Confirmation of this Plan to have the respective interests of NCNB and Farmers Home Administration determined by the Court, failing which Farmers Home Administration shall be deemed to be the first lien holder on all of the subject personal property at the aforesaid values.

3. *Unsecured Deficiency Claim of Farmers Home Administration.* (Approximately $750,000.00).

The Debtors propose to pay a percentage of this debt, without interest, in semi-annual installments of $250.00, plus $25.00

Trustee's fee, beginning July 15, 1989, through January 15, 1994. (See EII(c) for further details).

4. *Remaining Unsecured Claims.*

The Debtors propose to pay a percentage of these debts, without interest, in one installment of $100.00, plus $10.00 Trustee's fee within sixty (60) days after confirmation of the Plan herein.

E. PLAN PAYMENTS TO TRUSTEE: The Plan proposes the following payments to the Trustee:

I. *Lump Sum Payment:* The Debtors will pay $100.00, plus $10.00 Trustee's fee for unsecured deficiency claims, within sixty (60) days after confirmation of the Plan, pursuant to paragraph 4 (above).

II. *Semi–Annual Payments.* The Debtors will pay the following semi-annual payments to the Trustee on the following dates:

(a) $4,539.59, for Farmers Home Administration, plus a $453.96 Trustee's fee pursuant to paragraph 2(II)(d) above. These payments shall be due each July 15th and January 15th, beginning July 15, 1989, and ending July 15, 1993. (Balloon due January 15, 1994, outside the Plan).

(b) Computed payment for Farmers Home Administration, plus a 10% Trustee's fee, pursuant to paragraph 2(11)(e) above. These payments shall be due each July 15th and January 15th, beginning July 15, 1989, and ending July 15, 1993. (Balloon payment due January 15, 1994, outside the Plan).

(c) $4,922.58, for Ford Motor Credit Company, plus a $492.26 Trustee's fee pursuant to paragraph 2(III) above. These payments shall be due each July 1st and January 1st, beginning July 1, 1989, and ending January 1, 1994.

(d) All of Debtors' remaining disposable income, with a minimum of $250.00, for unsecured deficiency claims of Farmers Home Administration, plus a $25.00 Trustee's fee pursuant to paragraph 3 above. Debtors' remaining disposable income shall be calculated as follows: Gross income per Federal Tax Return, less: All Plan payments and expenses, all taxes, all reasonable business expenses and all reasonable family living expenses, adjustments above the aforesaid minimum, plus a 10% Trustee's fee thereon shall be payable annually beginning July 1, 1990. Debtors shall send the Trustee and Farmers Home Administration a copy of their Federal Income Tax Return beginning with the tax year 1989, and an annual report, showing the figures necessary to make the aforesaid calculation, on or before June first of each year, beginning in 1990.

F. PLAN DISBURSEMENTS BY TRUSTEE: The Plan proposes disbursements by the Chapter 12 Trustee within thirty (30) days following each of the Plan payments proposed for the first five years of the Plan. Reference is hereby made to paragraph E (above) for these proposed disbursements. In addition to the disbursements to be made by the Trustee, reference is hereby made to the various Plan provisions (above) calling for payments to be made by the Debtors directly to the various named secured creditors.

G. MISCELLANEOUS PROVISIONS: The Plan proposes the following miscellaneous provisions in addition to those rights and responsibilities of the Debtors as provided by law:

1. The Plan proposes that the Chapter 12 Trustee receive fees and commissions of 10% of all payments made to and distributed by the Trustee with a minimum annual commission of $500.00.

2. The Plan proposes that attorney's fees and expenses in addition to the retainer shall be paid outside the Plan within thirty (30) days after Court approval.

3. Payments for leased farm land shall be brought current or the leasehold interest abandoned by July 1, 1989. Lease payments shall be paid outside the Plan without Trustee's fee or commission.

4. The Debtors are authorized to execute all necessary documents to evidence debts as restructured in this Plan.

5. Future crops may be pledged to secure post-confirmation financing for the Debtors.

6. The amounts shown in parentheses in paragraph 2 (above) after the names of the various secured creditors are approximate and shall be automatically amended (without the necessity of the filing of a formal amendment) to the exact amounts of the claims allowed by the Court. To the extent that the allowed amount of other allowed secured claims (ahead in priority) are reduced, the secured claim of Farmers Home Administration (secured by real estate) will automatically be raised, however, the amount of the periodic payments to Farmers Home Administration will remain as called for above.

H. EFFECT OF CONFIRMATION: The Court shall retain jurisdiction of assets of the estate pending the Debtors' discharge. The Debtors may seek modification of the Plan after confirmation pursuant to 11 U.S.C. § 1229. Confirmation shall bind the Debtor, each creditor, and each equity security holder as provided in 11 U.S.C. § 1227. Except as provided by separate Court Order, the confirmation of the Plan shall continue to act as a stay of any action against the Debtors or property of the estate of the Debtors, except for the collection of post-confirmation debts as provided above.

I. DISCHARGE: Upon completion of all payments provided for under the Plan, the Debtors shall be discharged by the Court, except as provided in 11 U.S.C. § 1228(a).

J. POST PETITION ASSETS: Assets acquired after the filing of the original Petition herein shall be deemed property of the estate until such time as Debtors receive their discharge herein and the Trustee is relieved of his duties and responsibilities herein.

K. In the event the Debtors fail to make a scheduled payment to a secured creditor or defaults in any other provision of the Plan and said default (either monetary or nonmonetary) is not cured within twenty (20) days of said default, the Trustee shall issue notice of sale to liquidate the assets of the Debtors' estate and shall proceed to liquidate said assets. In said event, the Trustee shall be entitled to fees and expenses (not including auctioneer's commission) equal to 10% of the gross proceeds of sale.

Dated: January 26, 1989.

(s) A. Milton Rape
A. MILTON RAPE, Debtor

(s) Bonnie W. Rape
BONNIE W. RAPE, Debtor

(s) Robert L. Lindsey, Jr.
ROBERT L. LINDSEY, JR., Attorney for the Debtors